*In re* MARRIAGE OF MICHAEL J. GATTONE, Petitioner-Appellant, and CONNIE M. GATTONE, Respondent-Appellee.

Second District    No. 2—99—1109

Opinion filed November 15, 2000.

Frank M. Valenti, of Villa Park, for appellant.

Paul R. Jenen, of Wheeling, and Robert A. Bush, of Bush & Bush, P.C., of Elizabeth, for appellee.

PRESIDING JUSTICE BOWMAN delivered the opinion of the court:

On September 7, 1999, the circuit court of Carroll County entered a judgment dissolving the marriage of petitioner, Michael Gattone (Michael), and respondent, Connie Gattone (Connie). Michael appeals, arguing that the trial court erred by (1) designating certain real estate and a joint stock account as marital property; (2) awarding Connie a larger share of the marital estate than Michael; (3) awarding Connie maintenance and ordering Michael to pay for her health insurance;

and (4) ordering Michael to pay $9,500 toward Connie's attorney fees as a sanction for violating a court order that prohibited dissipation of the marital estate. We affirm the trial court in part and reverse in part.

Michael and Connie met in October 1994 and married on January 14, 1995. Michael filed a petition for dissolution on June 26, 1998, and Connie filed her own petition for dissolution on July 29, 1998. They did not have any children together but each had children by a prior marriage. At the time of the dissolution, Michael was 53 and Connie was 52.

The parties' testimony revealed that prior to the marriage Connie lived and worked in Wisconsin. She owned a house there and a car. She worked two part-time jobs at a hospital. Through her employment she had health insurance and a retirement plan. When Connie married Michael, she quit her jobs and moved to Michael's house in New Lenox, Illinois. Connie testified that she wanted to find new employment but Michael insisted that she stay at home. After she and Michael separated, Connie worked as a bartender.

When the parties met, Michael was recuperating from injuries he sustained in a car accident that occurred on July 4, 1994. The accident claimed the life of Michael's then wife, Lynne. After the accident, Michael retired from his job with Ameritech and took a lump-sum settlement of $180,000 from his retirement plan. He placed those funds in an individual retirement account (IRA) in his name. The IRA remained in Michael's name throughout his marriage to Connie. At the time of the dissolution, the value of Michael's IRA was $800,000. Michael received monthly distributions from his IRA in the amount of $1,500.

Michael also received a settlement of approximately $175,000 as a result of the accident. He deposited the settlement funds in a joint stock account, which the parties referred to as the "Active Assets Account" (AAA account). The AAA account was in both Michael's and Connie's names. The parties stipulated that the AAA account had a value of $130,000 at the time of the dissolution.

Shortly after Michael and Connie married, Michael sold his home in New Lenox as well as property he owned in Wisconsin. He received approximately $180,000 from the sale of these properties.

In August 1995, Michael and Connie bought a house in Savanna, Illinois, for which they paid $57,500. They later bought an adjacent piece of property and built a carriage house on it. They spent $75,000 for improvements on the home and the carriage house (collectively, the Savanna property). Michael testified that all of the funds used for the purchase and improvement of the Savanna property came from the sale of the properties he owned prior to the marriage. Because Mi-

chael was physically unable to do so, Connie performed most of the maintenance on the Savanna property, including mowing part of the lawn, shoveling snow, cleaning the gutters, and cleaning the inside of the house. At the time of the dissolution, the value of the Savanna property was $175,000.

Approximately one year into the marriage, Connie sold her house in Wisconsin and received proceeds of $28,600 from the sale. Connie testified that Michael did not want to keep any of the furniture or household items from her Wisconsin house, so she gave them away. After paying bills, she initially put the remaining money in an account solely in her name. She later transferred the money, about $17,000, to the AAA account.

The parties owned a number of different vehicles at the time of the marriage's dissolution. One of those vehicles was a 1994 Lexus. The Lexus was the last in a succession of vehicles the parties bought and then traded in for different vehicles. Prior to the marriage, Connie owned a Toyota Camry. When she moved to Illinois, Michael told Connie to leave the Camry in Wisconsin, which she did. When Connie sold her Wisconsin home, she and Michael used the Camry as a trade-in on a new car, a Corvette that Michael selected. They later traded in the Corvette for a Lincoln Towncar, and then traded the Towncar in for the Lexus. Connie testified that she wanted another Toyota Camry instead of a Lexus, but Michael insisted on buying a more expensive car. Connie said that Michael did not let her drive the Lexus. It was titled in both parties' names.

Michael testified that prior to the marriage he owned a 1961 Corvette with current value of $20,000. After he and Connie married, he added Connie's name to the title. During the marriage, he purchased a pontoon boat for $17,000 and a jet ski for which he paid $7,500.

Both parties testified that they had some health problems during the marriage. When Michael and Connie met, Michael was still recuperating from the injuries he sustained in the car accident and was in a wheelchair. He had surgery one week after he and Connie were married and was on crutches for several months. Later, he broke his leg in two places and was incapacitated for almost a year because he had a difficult time healing.

Connie testified that the health problems she experienced during the marriage included depression that required hospitalization, asthma, and a prolapsed heart valve. She stated that she took thyroid medication and antidepressants. Connie testified that she expected to have to return to work and that there was no reason why she could not work.

On cross-examination, Michael acknowledged that he had incurred credit card debt after he and Connie separated. After the petitions for dissolution were filed, the parties agreed that each would take $15,000 from the AAA account for their living expenses. Later, they each took an additional $5,000. In addition, Michael received $1,500 per month from his IRA.

After he and Connie separated, Michael bought his girlfriend a fur coat and a ring, lent his girlfriend $6,000 toward the purchase of a car, and paid for the first six months of her car insurance. He also spent over $2,000 on jewelry for his girlfriend's daughter. Michael admitted that he had paid approximately $24,000 on his credit cards since the separation. He testified that the funds he used to make these payments came either from the $20,000 he received pursuant to the parties' agreement or from the income he received from his IRA.

After hearing the parties' testimony, the court declared that the IRA worth $800,000 was Michael's nonmarital property and awarded it to him. The court further determined that the Savanna property and the AAA account were marital property. Connie received the Savanna property in its entirety and $50,000 from the AAA account. Michael received the remaining $80,000 from the AAA account. The court awarded the Lexus to Connie and ordered Michael to make the remaining payments on it. Michael received the pontoon boat, jet ski, and 1961 Corvette. The court ordered Michael to pay Connie maintenance of $1,000 for 72 months and to maintain medical insurance for Connie until she qualifies for Medicare or is able to obtain medical insurance through employment. Michael filed a timely notice of appeal from the trial court's judgment of dissolution.

## CLASSIFICATION OF PROPERTY AS MARITAL OR NONMARITAL

Michael disputes the trial court's classification of the Savanna property and the AAA account as marital property. He argues that the money that funded the AAA account and was used to purchase the Savanna property was traceable entirely to his nonmarital assets; therefore, the court should have deemed the Savanna property and the AAA account nonmarital property.

■ Before disposing of property upon a dissolution of marriage, the trial court must first classify the property as marital or nonmarital. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). A reviewing court will not disturb the trial court's classification unless it is contrary to the manifest weight of the evidence. *Hagshenas*, 234 Ill. App. 3d at 186.

■ Pursuant to section 503(b)(1) of the Illinois Marriage and Dis-

solution of Marriage Act (Act) (750 ILCS 5/503(b)(1) (West 1998)), there is a rebuttable presumption that all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage, including nonmarital property transferred into some form of co-ownership between the spouses, is marital property. A party may overcome this presumption by showing by clear and convincing evidence that the property falls into one of the categories listed in section 503(a) of the Act (750 ILCS 5/503(a) (West 1998)). *Hagshenas*, 234 Ill. App. 3d at 186. One such category is "property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent." 750 ILCS 5/503(a)(2) (West 1998).

■ Property designated as nonmarital under section 503(a) may still be presumptively transmuted into marital property by an affirmative act of the contributing spouse, such as placing nonmarital property in joint tenancy or some other form of coownership with the other spouse. *In re Marriage of Cecil*, 202 Ill. App. 3d 783, 787 (1990). This raises the presumption that the contributing spouse made a gift of the property to the marital estate. *Cecil*, 202 Ill. App. 3d at 787. The contributing spouse may overcome this presumption by presenting clear and convincing evidence that he or she did not intend to make a gift of the nonmarital property. *Cecil*, 202 Ill. App. 3d at 787. Any doubts as to the nature of the property are resolved in favor of finding that the property is marital. *In re Marriage of Hegge*, 285 Ill. App. 3d 138, 141 (1996).

■ Some of the significant factors for determining whether a party has successfully rebutted the presumption of a gift include (1) the size of the gift relative to the entire estate; (2) who paid the purchase price, made improvements, paid taxes on the property with solely acquired funds, and exercised control and management over the property; (3) when the asset was purchased; and (4) how the parties handled their prior financial dealings with each other. *In re Marriage of Guerra*, 153 Ill. App. 3d 550, 556 (1987). With these principles in mind, we conclude that the trial court's determination that the Savanna property and AAA account were marital property was not contrary to the manifest weight of the evidence.

## A. Savanna Property

■ The parties purchased the Savanna property during their marriage, so a rebuttable presumption existed that it was marital property. Michael argues that he rebutted this presumption by showing that the funds used to purchase the property were traceable entirely to his nonmarital assets. Connie does not dispute the source of the funds used to buy the Savanna property. Thus, Michael successfully rebutted the presumption that the property was marital.

Connie argues, however, that the Savanna property was transmuted into marital property. We agree that there was sufficient evidence to support such a finding. At all times during the marriage, the parties held the Savanna property in joint tenancy. Placing the property in joint tenancy was an affirmative act by Michael that raised the presumption that he intended to make a gift of the property to the marital estate. To overcome this presumption, Michael had to show by clear and convincing evidence that he did not intend to make a gift of the Savanna property. Relying primarily on *Guerra*, Michael asserts that the amount of the gift in relation to the size of the marital estate and the fact that all of the funds came from his nonmarital assets proved by clear and convincing evidence that he did not intend to make a gift of the Savanna property.

In *Guerra*, this court reversed the trial court's finding that the parties' residence was marital property. *Guerra*, 153 Ill. App. 3d at 558-59. The husband in *Guerra* used proceeds from the sale of his nonmarital assets to purchase the residence. He also paid for all household expenses, utilities, taxes, and insurance for the residence. *Guerra*, 153 Ill. App. 3d at 556-57. Unlike the case before us, however, the husband in *Guerra* placed title to the residence in a land trust and named himself as the sole beneficiary. *Guerra*, 153 Ill. App. 3d at 556. Also, the husband's will demonstrated his intention to keep the residence as his separate property. *Guerra*, 153 Ill. App. 3d at 557.

Michael latches onto our statement in *Guerra* that it was not reasonable to presume that the husband intended to make a gift of 44% of his nonmarital estate. *Guerra*, 153 Ill. App. 3d at 558. Michael is correct that the size of the purported gift was part of the reason we found that property at issue in *Guerra* was nonmarital, but the determination of whether property is marital or nonmarital does not hinge on a single factor. In *Guerra*, three out of the four factors weighed in favor of classifying the property as nonmarital. The size of the purported gift relative to the entire estate was large. The husband paid the purchase price and all of the expenses related to the house and exercised control over the house. In addition, the financial dealings of the *Guerra* parties demonstrated the husband's intent to keep the residence and other nonmarital assets separate from the marital assets. *Guerra*, 153 Ill. App. 3d at 556-58.

The facts of *Guerra* are quite different from those of the case before us. The size of the gift relative to the size of Michael's total nonmarital estate weighs in his favor, although to what degree depends upon how Michael's nonmarital estate is calculated. Michael's calculations of the value of his nonmarital estate are based on the value of his assets at the time he and Connie married. Thus, he values his IRA

at $180,000 instead of $800,000. Michael does not cite any authority that would support his method of calculating his estate. We note that in *Guerra* we did not determine the value of the husband's estate by looking at the value of his nonmarital assets on the date of the marriage but by looking at the total stipulated value of the assets the husband purchased from the sale of his nonmarital assets, which took place during the marriage. We also stated that we considered the "total nonmarital estate which [the husband] had acquired." *Guerra*, 153 Ill. App. 3d at 558. Under this method of calculation, it would seem appropriate to value Michael's IRA at $800,000, not $180,000. Thus, the amount of the gift is significantly lower than 68% of his nonmarital estate, as Michael proposes.

The second factor weighs partially in Michael's favor. He established by clear and convincing evidence that the purchase price, improvements, and taxes for the Savanna property came from money he acquired in exchange for his nonmarital assets. However, he did not establish by clear and convincing evidence that he exercised control and management over the Savanna property.

The third factor, when the assets were purchased, weighs in Connie's favor. Michael and Connie purchased the Savanna property about seven months after they married, with the intention that they would live there together.

The fourth factor, how the parties handled their prior financial dealings with each other, also weighs in Connie's favor. We find no facts in the record that demonstrate any intent on Michael's part to keep his nonmarital assets separate from the marital assets. There are steps Michael could have taken to make sure his nonmarital assets retained their distinct identity if that was his desire. We see nothing in the record to indicate such a desire, however. Accordingly, we conclude that the trial court's determination that the Savanna property was marital property was not contrary to the manifest weight of the evidence.

### B. AAA Account

■ Michael argues that he funded the AAA account entirely from the settlement award and the income he received from his IRA. This argument fails because the parties' testimony established that Connie contributed about $17,000 to the account. Further, under the analysis we engaged in above, it is apparent that the trial court correctly classified the AAA account as marital property. The AAA account was created after Michael and Connie's marriage and was a joint account. While the nonmarital assets that funded most of the account were substantial, Michael made no effort to segregate his funds or limit

Connie's access to them. The parties used the AAA account to fund their joint checking account. There was no evidence that Connie's use of the AAA or joint checking account was restricted in any way. For these reasons, we hold that the trial court's classification of the AAA account as marital property was not against the manifest weight of the evidence.

## DISTRIBUTION OF THE MARITAL ESTATE

■ Next, Michael disputes the trial court's distribution of the marital property. He contends that, because he contributed more to the marital estate and the marriage was short, the trial court's award of the bulk of the marital estate to Connie was against the manifest weight of the evidence. We disagree.

Section 503(d) of the Act instructs trial courts to divide marital property in just proportions considering all relevant factors, including the 12 factors listed in that section. 750 ILCS 5/503(d) (West 1998). Here, the trial court awarded Connie a significantly larger portion of the marital estate than Michael. It is impossible to determine the precise percentage of the estate that each party received because there was no evidence regarding the value of certain items of property such as the Lexus, the pontoon boat, or the jet ski. Of the parts of the marital estate that had a stipulated value, Connie received property totaling $225,000, which constituted 74% of the marital estate, and Michael received $80,000, or 26% of the marital estate.

It is well settled that a trial court is justified in awarding almost all of the marital property to one spouse if the other spouse has substantial nonmarital assets. *In re Marriage of Holman*, 122 Ill. App. 3d 1001, 1012-13 (1984). Here, Michael had $800,000 in nonmarital assets and income of $40,000 to $50,000 per year. Connie, in comparison, had no nonmarital assets. In light of this disparity, it was not against the manifest weight of the evidence for the trial court to award Connie most of the marital estate.

## MAINTENANCE AND HEALTH INSURANCE

■ We disagree with Michael that the trial court's award of maintenance to Connie was against the manifest weight of the evidence. The court ordered Michael to pay maintenance of $1,000 per month for 72 months. The court based this ruling on Connie's "health and questionable employability." Michael asserts that there is no evidence in the record to support this finding.

An award of maintenance lies within the sound discretion of the trial court, which we will not reverse absent an abuse of discretion. *In re Marriage of Toole*, 273 Ill. App. 3d 607, 611 (1995). Section 504(a) of the Act provides that the court may grant temporary or permanent maintenance after considering all of the relevant factors, including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of the party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment ***;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties." 750 ILCS 5/540(a) (West 1998).

Michael relies upon *In re Marriage of Albrecht*, 266 Ill. App. 3d 399 (1994), in arguing that the trial court abused its discretion in awarding maintenance. We find *Albrecht* inapposite because in that case the appellate court affirmed the trial court's decision not to award maintenance to either spouse. In so holding, the court noted that the marriage was short, the parties' lifestyle was not lavish, and the wife was employable despite her health problems. *Albrecht*, 266 Ill. App. 3d at 403. Contrary to Michael's argument, *Albrecht* does not stand for the converse proposition that it is always an abuse of discretion for a trial court to award maintenance when a marriage is of short duration, the parties' lifestyle is not lavish, and the spouse seeking maintenance is employable. We must examine the facts of the case before us to determine whether Michael met his burden of showing that the trial court abused its discretion in awarding Connie maintenance.

While Connie and Michael's marriage lasted only four years, the evidence showed that Connie left her employment in Wisconsin to move to Illinois with Michael and, at Michael's insistence, did not work during the marriage. After they separated, Connie worked as a bartender. Connie testified that she was not aware of any reason why she could not find a job, although she thought her age might make it somewhat difficult. She also testified that she had both physical and emotional problems, including a heart problem and depression that required inpatient treatment.

Michael argues that Connie did not produce any documentation or opinion evidence to support her claimed health problems. Michael did not make this argument in the trial court and does not cite any pertinent authority. Therefore, he has waived this argument. See *Eck-*

*iss v. McVaigh,* 261 Ill. App. 3d 778, 786 (1994). We also note that Connie's health problems were not the only basis for the court's decision on these issues.

It appears from the record that the trial court considered the relevant factors and determined that special circumstances existed that justified an award of maintenance to Connie. Specifically, the trial court relied on the facts that (1) Connie gave up her job and sold her house and her belongings to relocate to Illinois, (2) she did not work during the marriage at Michael's insistence and therefore had little recent job experience or contacts in the community where she lived; and (3) she had health problems that would diminish her ability to find work that would sustain her lifestyle.

Michael has not convinced us that the trial court abused its discretion in awarding maintenance to Connie. The record supported the trial court's factual findings, and we find no error in the court's analysis of the relevant factors. It is unlikely that Connie's wages as a bartender would have allowed her to maintain her standard of living. It appears that the award of maintenance was designed to provide Connie with income for a limited time so that she would not have to deplete all of her assets while she tried to find work.

For these same reasons, we conclude that the trial court did not abuse its discretion in requiring Michael to maintain medical insurance for Connie until she is covered by Medicare or is able to obtain insurance through employment. Connie gave up her job and the health insurance she had through her job when she moved to Illinois with Michael. She did not have an opportunity to obtain health insurance through an employer during the marriage because Michael did not want her to work. Ordering Michael to continue to pay Connie's health insurance until she is able to obtain insurance through employment or Medicare was reasonable under these circumstances and did not constitute an abuse of discretion. In addition, Michael presented no evidence to the court regarding the cost of providing continued coverage for Connie. Absent any such evidence, we cannot from the record find an abuse of discretion.

## ATTORNEY FEES

Last, Michael appeals the trial court's order that he pay $9,500 toward Connie's attorney fees because of his violation of court orders prohibiting him from using credit cards and dissipating marital assets. Michael argues that the trial court was required to hold a hearing to determine whether he violated a court order and whether the alleged violation was without compelling cause or justification.

After the parties filed their respective petitions for dissolution,

they agreed that each would take $15,000 from the AAA account to cover living expenses. Later, they each took an additional $5,000. Michael also received $1,500 each month from his IRA, which he put in a separate AAA account in his name. On December 12, 1998, pursuant to a petition for a rule to show cause filed by Connie, the court entered an order prohibiting both parties from withdrawing any additional funds from their accounts or using any credit or debit cards. In Connie's recommended allocation statement, she asked the court to require Michael to contribute $9,500 toward her attorney fees "as a result of dissipation of assets and contemptuous behavior." The court heard testimony concerning the alleged dissipation of assets. In its judgment for dissolution of marriage, the trial court ordered:

> "That as a result of the Petitioner's violation of prior Court Orders, he is further ordered to pay Respondent's attorney's fees in the amount of Nine Thousand Five Hundred Dollars ($9,500.00) within sixty (60) days of the entry of this Judgment for Dissolution of Marriage."

After the hearing on the property division issues, Connie filed "Respondent's Acknowledgment or Allegation of Dissipation of Assets." This document stated that Michael had incurred approximately $24,000 in credit card debt between June and December 1998, had lent his girlfriend $15,000, and had spent $9,000 on a car. At trial, Michael acknowledged that he made a loan to his new girlfriend, financed a new car for her, and bought her a fur coat and a diamond ring.

We note initially that Michael did not raise any objection in the trial court to the award of attorney fees. It is well settled that issues not raised in the trial court are generally deemed waived and may not be raised for the first time on appeal. *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 500 (1985). The reason for this general rule is that the appellate court should not consider different theories or new questions on appeal if proof might have been offered to refute or overcome them had they been presented below. *Carter v. Dunlop*, 138 Ill. App. 3d 58, 60 (1985). However, it is equally well settled that waiver is an admonition to the parties rather than a limitation on the reviewing court's jurisdiction and it may be relaxed in order to obtain a uniform body of precedent or where the interests of justice so require. *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 480 (1991). Here, we choose to consider Michael's argument on this issue despite his waiver because certain aspects of the court's ruling trouble us.

Both parties presume that, in ordering Michael to contribute to Connie's attorney fees, the court acted under section 508(b) of the Act (750 ILCS 5/508(b) (West 1998)). The trial court did not articulate the

statutory basis for the award of attorney fees, but it stated in its memorandum opinion and judgment for dissolution that the reason for the award was Michael's violation of a court order. Thus, it appears that the court made the award pursuant to section 508(b), which provides:

> "(b) In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If non-compliance is with respect to a discovery order, the non-compliance is presumptively without compelling cause or justification, and the presumption may only be rebutted by clear and convincing evidence. If at any time a court finds that a hearing under this Section was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 1998).

The first problem we have with the court's order is that the evidence did not support the finding that Michael violated a court order. The only order in the record that prohibited Michael from using his credit cards or withdrawing any money from the marital estate was entered on December 11, 1998. The evidence Connie presented concerning Michael's improper expenditures showed that the vast majority of them occurred before December 11. After the order was entered, there were credit card payments totaling $4,000 made on December 16, 1998, and December 23, 1998, but it is impossible to determine whether those payments related to purchases made before or after the December 11 order. Therefore, we cannot agree with the trial court that Michael violated the court's order.

Further, section 508(b) requires a finding that a party violated a court order "without compelling cause or justification" before the court can award attorney fees as a sanction. 750 ILCS 5/508(b) (West 1998). The trial court did not state that Michael's alleged violation was without cause or justification.

Next, section 508(b) provides for an award of attorney fees related to a "proceeding for the enforcement of an order or judgment." 750 ILCS 5/508(b) (West 1998). The record seems to indicate that the trial court did not limit the award of attorney fees to Connie's efforts to enforce the December 11 order but instead ordered Michael to contribute toward Connie's attorney fees for the dissolution proceeding as a whole. If Connie wanted to seek attorney fees from Michael, the proper method for doing so was to file a petition for contribution to fees and

costs pursuant to section 503(j) of the Act (750 ILCS 5/503(j) (West 1998)). It was improper for the trial court to award Connie attorney fees for the dissolution proceeding in general under section 508(b).

Our last point of contention pertains to the amount of the award and the absence of a determination by the trial court that the fees requested were reasonable. This court has held that an award of attorney fees under section 508(b) is "subject to a determination of reasonableness based on, *inter alia*, the time spent, the ability of the lawyers, and the complexity of the work." *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1098 (1992). We find nothing in the record regarding any of the above factors. It appears that the trial court did not determine the basis for the amount of fees Connie requested or whether that amount was reasonable. For all of the foregoing reasons, we conclude that the trial court erred in ordering Michael to contribute $9,500 toward Connie's attorney fees, and we reverse that portion of the trial court's judgment.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Carroll County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

HUTCHINSON and GALASSO, JJ., concur.