Nos. 2--01--0469 & 2--01--0678 cons. 

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

In re
 MARRIAGE OF TERRY FRANCES ) Appeal from the Circuit

ACKERLEY, ) Court of Kane County.

)

Petitioner-Appellee,
 )

) 

and ) No.
 92--D--403

)

ROBERT ALAN ACKERLEY, ) 
Honorable

) M. Karen Simpson,

Respondent-Appellant.
 ) Judge, Presiding.

JUSTICE GROMETER delivered the opinion of the court:

Respondent, Robert Alan Ackerley, appeals a series of orders entered by the circuit court of Kane County arising out of litigation where petitioner, Terry Frances Ackerley, sought, 
inter alia
, the enforcement of various provisions of the parties' marital settlement agreement.  Relevant to the instant appeal, the trial court (1) ordered respondent to pay a child-support arrearage in the amount of $90,975.41; (2) set respondent's current child-support obligation at $3,000 per month; (3) found respondent in contempt for failing to comply with a provision of the marital settlement agreement; (4) awarded petitioner $2,300 for attorney fees incurred while seeking the enforcement of the agreement; and (5) denied respondent's request to stay the enforcement of the judgment for the child-support arrearage.  For the reasons that follow, we dismiss this appeal in part and otherwise affirm as modified.

I. BACKGROUND

On March 30, 1992, the circuit court entered a judgment dissolving the marriage between petitioner and respondent.  This order incorporated a written marital settlement agreement.  By the terms of the agreement, the parties were awarded joint custody of their son and daughter, and the children were to reside with petitioner.  At the time of the dissolution, respondent was employed by the Krughoff Company (Krughoff) and earned a base annual salary of $62,000 plus bonuses.  The agreement provided that respondent would pay a base amount of child support of $250 per week and additional child support equal to 25% of any "net bonus as defined by statute" received by him from his employer.  It also contained the following provision: "For verification purposes, father shall provide mother with copies of W-2 forms or other tax related statements indicating the bonus he has received on or before January 31st of every calendar year for the preceding calendar year."  Respondent remained current on his weekly child-support payments, which increased to $420 in July 2000.  He also paid petitioner a portion of his bonus each January through the year 2000.

In 1998, respondent became president of Krughoff.  A written employment agreement was executed in April of that year and was periodically updated.  The agreement provided for a base salary of $120,000 per year and an additional payment of $7,500 quarterly if Krughoff achieved at least that much profit during the quarter.  Further, respondent was to receive year-end bonuses if certain profit levels were attained.  The agreement also provided that respondent would lend a portion of his bonus back to the company.  In 1998, the agreement specified a 25% loan.  In 1999, this figure was reduced to 15%.  Krughoff paid respondent 7% interest on these loans, which were memorialized by a series of notes.  Krughoff was scheduled to start repaying these loans on December 31, 2002.  Respondent's income at the time of the trial was $3,211.34 per week or approximately $167,000 per year.

Each January from 1994 to 2000, respondent provided petitioner with a written explanation of how the amount of child support due on his bonuses was calculated.  Respondent did not provide petitioner with W-2 forms or other similar documents generated for reporting income to the taxing authorities.  The documents that were provided were apparently generated by someone at Krughoff.  Except for the document explaining the 1994 bonus, which is handwritten, they were produced on paper bearing Krughoff's letterhead.  None of them show respondent's total income for the year.  They do show the total bonus as well as deductions for state and federal income tax, social security tax (FICA), and dependent health insurance.

In addition to the bonuses disclosed in the January statements, respondent received bonuses in June 1999 and January 2000 that he did not disclose.  In June 1999, respondent received a bonus in the amount of $58,870.  He testified that he received this bonus in June because of an accounting error that was discovered when the company's records were reviewed by an outside auditor who determined that the bonus should have been paid to him previously.  Respondent testified that he asked a friend, who was an attorney, what he should do regarding this bonus and the friend told him he "shouldn't worry about it."  In January 2000, respondent received two bonuses.  The first was in the amount of $235,400 and was disclosed to petitioner.  Respondent paid child support on this bonus.  The second, in the amount of $145,655, was not disclosed to petitioner, and no child support was paid based on this bonus.  Respondent explained that, on the advice of an individual who runs a concrete company, he came to believe that he was entitled to deduct sums that he lent to the company pursuant to his employment agreement from his bonuses for the purpose of calculating child support.  Accordingly, he unilaterally deducted $145,000 from his 2000 bonus, as he had not deducted these sums for previous years.  Respondent also acknowledged that he once asked that his weekly paycheck be increased instead of waiting to receive money due him in his yearly bonus and that on one occasion Roy Krughoff, the company's  chief executive officer, increased his weekly salary so that respondent would not have to wait for his bonus.

The trial court found respondent in contempt, ordered that he pay back child support due on his bonuses as well as $2,300 for petitioner's attorney fees, terminated the bonus child-support system under which the parties had been operating, and fixed monthly child support at $3,000.  The trial court found respondent in indirect civil contempt for failing to provide petitioner with his W-2 forms or other tax-related documents.  The trial court reasoned that the plain language of the marital settlement contemplated that respondent would provide petitioner with a document that was "categorically equivalent to a W-2 statement" as opposed to the self-produced summaries that respondent had provided.  The court also found that respondent bore an affirmative obligation to provide such documents, regardless of any action or inaction by petitioner, since the marital settlement agreement stated respondent "shall" provide them.  The court observed that "shall" is a mandatory term.  The court found respondent's failure to tender these documents to be "willful and contemptuous."  Specifically, the court found that respondent was trying to create the appearance of complying with the agreement when, in fact, he was intentionally secreting information from petitioner.

The trial court then found that respondent was not entitled to deduct from his bonuses sums loaned back to Krughoff pursuant to his employment agreement.  The court stated that it viewed these loans as something "in the nature of some kind of a tax deferred interest bearing account."  The court then calculated the amounts due on the bonuses respondent received from 1994 through 1999.  The trial court deducted federal income taxes, state income taxes, and Medicare taxes from the bonuses before calculating the amount due.  It did not deduct FICA or expenditures for dependent health insurance.  The trial court also added income tax refunds back into the bonuses.  The trial court adjusted the tax refunds by deducting amounts attributable to respondent's second wife.

After calculating the arrearage for the disclosed bonuses for the years 1994 to 1999, the trial court awarded petitioner $27,032.50 for the two bonuses that were not disclosed.  Next, the trial court considered what it termed "excess bonuses."  The court noted that for the years 1998 to 2000, approximately $145,000 was not accounted for in either respondent's base pay or bonuses; this amount the court referred to as "excess bonus."  Accordingly, the court found that this too was bonus money, and it awarded petitioner $35,527.71 based on this sum.  Ultimately, the trial court determined that respondent owed a total of $90,975.41 in back child support.

The trial court next addressed the issue of current child support.  The trial court terminated respondent's obligation to pay a percentage of his bonuses as support and instead calculated his monthly obligation based on his total income.  The court determined that, if it were to follow the statutory guideline, support would be set at $5,510 per month.  However, the court found that fixing support at this level would result in a windfall to the children.  Accordingly, the court deviated downward from the statutory guideline and set support at $3,000 per month.

Finally, the trial court ordered that respondent contribute $2,300 toward petitioner's attorney fees.  The court stated that it was awarding fees pursuant to sections 503(j) and 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(j), 508(b) (West 2000)).  In making this award, the trial court stated that it had considered the relevant factors set forth in these sections.

Respondent then moved to stay the enforcement of the court's order and sought to present an appeal bond.  The trial court denied respondent's request.  The trial court held that section 413(a) of the Act (750 ILCS 5/413(a) (West 2000)) precluded staying the enforcement of an order directing the payment of child support pending an appeal.

II. ANALYSIS

On appeal, respondent raises five primary issues.  First, he contends that the trial court incorrectly calculated the child-support arrearage.  Second, he complains that the trial court erred in fixing child support at $3,000 per month.  Third, he asserts that the trial court erred by finding him in contempt.  Fourth, he contends that the trial court's award of attorney fees was erroneous.  Fifth, he argues that the enforcement of the trial court's order should have been stayed pending appeal.  We will address these issues 
seriatim
.

A. The Child-Support Arrearage

Respondent raises two basic complaints regarding the trial court's calculation of the child-support arrearage.  He contends that the trial court did not give him credit for every deduction to which he was entitled in determining his net bonuses for the purpose of calculating support.  He also takes issue with the trial court's math.  The parties' marital settlement agreement provided that respondent was obligated to pay child support in "a sum representing twenty-five (25%) of his net bonus as defined by statute."  The relevant statutory provision, section 505(a)(3) of the Act, defines "net income" as follows:

"(3) 'Net income' is defined as the total of all income from all sources, minus the following deductions:

(a) Federal income tax (properly calculated withholding or estimated payments);

(b) State income tax (properly calculated withholding or estimated payments);

(c) Social Security (FICA payments);

(d) Mandatory retirement contributions required by law or as a condition of employment;

(e) Union dues;

(f) Dependent and individual health/hospitalization insurance premiums;

(g) Prior obligations of support or maintenance actually paid pursuant to a court order;

(h) Expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income ***." 750 ILCS 5/505(a)(3) (West 2000).

The determination of the amount of a child-support arrearage is a factual issue; therefore, we will disturb the decision of the trial court only if the decision is contrary to the manifest weight of the evidence.  
In re Marriage of Belluomini
, 104 Ill. App. 3d 301, 308 (1982).

The trial court deducted only federal and state income tax and Medicare from respondent's bonuses in establishing the net bonuses that would, in turn, serve as the basis for calculating child support due on the bonuses.  Respondent contends that the trial court should have also deducted from his bonuses FICA, dependent health insurance expenses, and the loans he made to Krughoff pursuant to his employment agreement.  In related arguments, respondent maintains that the trial court should not have added back into his bonuses amounts received as income tax refunds or considered the effect of respondent's second wife's income on his taxes without a proper evidentiary basis.  Respondent also criticizes the trial court for characterizing some of his income as "excess bonuses."

We first conclude that the trial court did not err by failing to deduct FICA and dependent health care insurance costs from respondent's bonuses.  Unlike income tax, which is based on a percentage of all income, these expenditures are fixed.  
In re Marriage of Olson
, 223 Ill. App. 3d 636, 652 (1992) (Withholding for FICA ceases after a certain income level is achieved.  "Bimonthly payroll receipts for periods less than a year for a noncustodial parent with above-average income may not reflect true income because such partial records do not reflect increased income on reaching maximum FICA withholding").
  Hence, in the present case, they can be either deducted from respondent's bonuses or added to respondent's base pay for calculating the base child-support amount.  The mere fortuity that respondent received his bonuses early in January, which often terminated his FICA obligation for the balance of the year and allowed him to collect his base salary free of this tax, should not work to disadvantage petitioner and the children.  Moreover, we note that respondent's $250-per-week child-support obligation would not have approached the statutory guideline for the support of two children if these sums were not attributed to base salary as respondent's income level increased.  In short, we find no error in attributing deductions for dependent health insurance and FICA taxes to respondent's base salary instead of to his bonuses.

We further find no error in the trial court's refusal to deduct what respondent terms "mandatory loans" from his bonuses.  These loans were sums withheld from respondent's yearly bonuses as set forth in respondent's written employment agreement.  The loans were evinced by three notes, which reflected the terms set forth in the employment agreement.  Krughoff was scheduled to begin repaying two of the loans on December 31, 2002, and one on January 1, 2003.  The former two were to be fully repaid by December 31, 2004, and the latter by January 1, 2005.  Payments of approximately one-third of the value of the loans were to occur on a yearly basis.  Respondent received 7% interest 
per annum
.

Respondent first attempts to analogize these loans to "[e]xpenditures for repayment of debts that represent reasonable and necessary expenses for the production of income."  750 ILCS 5/505(a)(3)(h) (West 2000).  He next attempts to analogize these loans to "[m]andatory retirement contributions required *** as a condition of employment."  750 ILCS 5/505(a)(3)(d) (West 2000).  We find both attempts unpersuasive.  The loans do not represent repayment of a debt; rather, they represent sums that respondent will ultimately receive at a later date.  He has, in essence, paid nothing.  Expenditures for the production of income are not deductible if they do not represent a repayment of a debt.  
Gay v. Dunlap
, 279 Ill. App. 3d 140, 145 (1996).  Nor do these loans appear to have anything to do with retirement.  By the terms of the notes, respondent will begin receiving payments on all three in December 2002 and January 2003 (which is, perhaps coincidentally, about nine months after his youngest child turns 18) regardless of whether he retires at that time.  Thus, the loans are not encompassed by any of the categories of deductions set forth in section 505(a)(3) of the Act (750 ILCS 5/505(a)(3) (West 2000)).  They appear to us to be most analogous to some sort of short-term deferred compensation agreement.  It has been held that "deferred compensation falls under none of the allowable deductions specified under section 505(a)(3)."  
Posey v. Tate
, 275 Ill. App. 3d 822, 826 (1995).  Accordingly, the trial court did not err in refusing to deduct these loans from respondent's bonuses.

We agree with respondent that it was 
unnecessary for the trial court to add respondent's tax refunds back into his bonuses.  In calculating the child support arrearage, we had respondent's tax returns and W-2 forms available for all but the final year in question.  Thus, we were able to use the actual amount of income 
respondent received as well as the actual tax he paid as shown on these forms.  Section 505(a)(3)(a) of the Act allows for the deduction of federal income tax from gross income to determine net income for the purpose of calculating child support.  750 ILCS 5/505(a)(3)(a) (West 2000).  The Act defines "[f]ederal income tax" as "properly calculated withholding or estimated payments."  750 ILCS 5/505(a)(3)(a) (West 2000).  Properly calculated withholding is, by definition, withholding that coincides with actual tax owed on one's gross income.  Thus, in calculating respondent's net income, we deducted the actual federal income tax that he paid from the actual total income that he received.  An alternate approach employed by some courts is to begin with net income and add back in any refunds, which represent overwithholding.  See 
In re Marriage of Pylawka
, 277 Ill. App. 3d 728, 733 (1996) ("Thus, if the noncustodial parent overwithholds on his W-2, thereby overpaying his Federal income tax, the amount should be added back to his net income for purposes of determining his support obligation under section 505(a) of the Act").  These approaches represent two sides of a single mathematical coin.  Because we have the benefit of having respondent's tax returns for past years available, we have chosen to employ the former approach, as it simplifies the calculation.  Further, we agree with respondent that the effect of respondent's wife's income on his tax refunds should have been ignored.  We note, however, that respondent's wife's income was relatively trivial when compared with respondent's income.  Thus, whether one accounts for her income makes little difference to the ultimate determination of the amount of the arrearage.

Regarding the trial court's characterization of portions of respondent's income as "excess bonuses," we find no error.  Respondent's employment agreement states that his base pay is $120,000 per year.  Respondent testified that he increased his base salary, with Roy Krughoff's consent, when the company was having good years rather than waiting until the end of the year to receive the money.  Additionally, the following colloquy took place between  respondent and petitioner's counsel:

"Q[.] So you did not want to wait until January to

receive a lump-sum bonus, you wanted to increase your weekly take to offset against deficits, is that correct?

A[.] I increased my bonuses to enjoy money earlier."

Thus, evidence in the record provides a basis for the trial court's finding that funds received by respondent in excess of his base pay but not explicitly characterized as bonus monies was, in actuality, a bonus.  Respondent points out that he testified that his weekly income increased because he was working harder.  Resolving conflicts in the evidence lies within the province of the trier of fact.  
Williams v. Cahill
, 258 Ill. App. 3d 822, 825 (1994).  Given the state of the record, we cannot say that the trial court's characterizing these sums as bonuses was contrary to the manifest weight of the evidence. 

Having concluded that the trial court gave respondent the benefit of appropriate deductions from his bonuses, we now turn to the actual calculation of the arrearage.  We will not set forth the calculations for every year in detail.  Instead, we will explain our methodology and set forth our calculations for one year as an example.  Before proceeding, however, we note that respondent complains that the trial court did not set forth its calculations in detail and that it is thus impossible to determine how the trial court derived the amount of the arrearage it found to be due.  It would have been helpful indeed if the trial court had set forth its calculations and would have greatly facilitated our review of this cause.  Nevertheless, we review the correctness of the trial court's result rather than the correctness of its reasoning.  
Department of Mental Health & Developmental Disabilities v. Illinois Civil Service Comm'n
, 103 Ill. App. 3d 954, 957 (1982).  Hence, respondent's request that we remand the matter so that the trial court can clarify and possibly revise its calculations is ill taken.  This court can recalculate the child-support arrearage and determine if the result reached by the trial court was correct.

In recalculating the arrearage, we applied the following formula.  We first determined the amount of federal income tax attributable to a bonus.  To do so, we divided the bonus by the total income for the given year.  This yielded a ratio of bonus to total income.  We then multiplied the total federal income tax for the year by the ratio.  This yielded a figure that represented a proportionate share of the tax attributable to the bonus.  By attributing a proportionate share of the tax to the bonus, we eliminated the effect of tax bracketing used in the federal income tax system.  We believe that eliminating this effect is equitable.  Neither party should benefit or be prejudiced by the artifice of considering certain income as falling into a certain bracket.  Moreover, in determining appropriate child support, we are not bound by the technicalities of federal income tax law.  See 
In re Marriage of McGowan
, 265 Ill. App. 3d 976, 979 (1994).  To determine the appropriate deductions for state income tax and Medicare, we multiplied the bonus by .03 and .0145, respectively.  We then subtracted state and federal income tax and Medicare from the bonus to derive the net bonus.  We next multiplied the net bonus by .25 to determine child support due on the bonus.

For example, for 1995, we engaged in the following calculations.

Federal Income Tax Attributable to Bonus

Total Income

$153,636

Bonus

$48,827

Ratio (Bonus ÷ Total Income)

(rounded to nearest thousandth for reproduction here)

.318

Federal Income Tax

$32,289

Federal Income Tax Attributed to Bonus 

(Ratio × Tax)

$10,261.76

Child Support Arrearage Due on Bonus

Bonus

$48,827

- Federal Income Tax

$10,261.76

- State Income Tax

     ($48,827 × .03 = 1,464.81)

$1,464.81

- Medicare

     ($48,827 × .0145 = 707.99)

$707.99

= Net Bonus

$36,392.44

× .25 (per marital settlement agreement)

$9,098.11

- Child Support Actually Paid On Bonus

$7,024.75

= Arrearage

$2,073.36

We performed these calculations for each year.  Regarding respondent's two undisclosed bonuses, we included them in the total bonus for the year in which they were received instead of treating them separately as the trial court did.  Regarding the excess bonuses, we merely subtracted base income and those amounts characterized as a bonus by respondent from the total income for the given year.  We then used the figure derived as a base for calculating the arrearage for the excess bonus, which we did by applying the formula set forth above. 

After calculating the arrearage for each year, we totaled the arrearages and determined that the total amount of the arrearage was $76,672.57.  The trial court determined that the total arrearage amounted to $90,974.41.  Thus, to the extent that the trial court's calculation differs from ours, it is contrary to the manifest weight of the evidence.  Accordingly, the judgment of the trial court is modified to reflect an arrearage of $76,672.57.

We have been unable to duplicate the trial court's calculations with precision; however, we believe we have identified the source of the error.  The trial court may have inadvertently included the June 1999 undisclosed bonus of $58,870 two or three times in calculating the arrearage.  In calculating the arrearage for the 1999 disclosed bonus, the trial court used a figure of $264,977,22.  The disclosed bonus for that year was $208,102.  Adding in the undisclosed bonus, we arrive at a figure of $266,972.  Although this is not the exact number used by the trial court, the difference may be attributable to some additional deductions the trial court was making, such as the effect of respondent's wife's income on respondent's taxes.  Thus, it appears that the undisclosed bonus was included in the award for the 1999 disclosed bonus.

Later, the trial court awarded $27,032.50 for "the two bonuses that were not disclosed."  By this, the court presumably meant the undisclosed January 2000 bonus of $145,655 and the June 1999 bonus, as these were the only two undisclosed bonuses.  Thus, it appears that the June 1999 bonus was counted a second time.

Still later, the trial court may have included the June 1999 bonus in its excess-bonus award.  The trial court apparently accepted petitioner's reasoning regarding the "excess bonuses," as both the trial court and petitioner arrived at the same figure.  In written closing argument, petitioner set forth the following calculation regarding the excess bonus for 1999.

Gross Pay

Less Base Pay

Less Bonus

= Excess Bonus

$472,010.32

$120,000

$208,102

$143,908.32

The disclosed bonus for 1999 was $208,102.  The undisclosed bonus was presumably part of respondent's total pay for the year reflected in his tax return and W-2 form.  Thus, the undisclosed bonus should have been, but was not, subtracted in determining the amount of the excess bonus.  Accordingly, the trial court may have based portions of its award on the June 1999 undisclosed bonus a third time.  The inclusion of respondent's tax refunds in the yearly bonuses may have also artificially inflated the trial court's award.

B. Child Support

Respondent next complains that the trial court did not sufficiently deviate downward from the statutory guideline (see 750 ILCS 5/550 (a)(1) (West 2000)) in setting child support.  A court may deviate from the guidelines as the circumstances warrant.  750 ILCS 5/505(a)(2) (West 2000).  In deciding whether to deviate from the guidelines, a court is directed to consider the following, nonexclusive, list of factors:

"(a) the financial resources and needs of the child;

(b) the financial resources and needs of the custodial parent;

(c) the standard of living the child would have enjoyed had the marriage not been dissolved;

(d) the physical and emotional condition of the child, and his educational needs; and

(e) the financial resources and needs of the non-custodial parent."  750 ILCS 5/505(a)(2) (West 2000).

A determination regarding the appropriate amount of child support will be reversed only if the trial court abused its discretion.  
In re Marriage of Takata
, 304 Ill. App. 3d 85, 96 (1999).  An abuse of discretion occurs only where no reasonable person could agree with the position taken by trial court.  
Takata
, 304 Ill. App. 3d at 96.

At the time of trial, respondent's daughter had reached the age of majority, and respondent was only obligated to pay support for his son.  Thus, section 505(a)(1) of the Act (750 ILCS 5/505(a)(1) (West 2000)) establishes 20% of respondent's income as a guideline for determining respondent's support obligation.  The trial court determined that the guidelines would indicate that an award of $5,510 per month was appropriate.  However, the trial court found that such an award would result in a windfall to the children.  Based upon the relative financial needs and resources of the parties and the standard of living respondent's son would have enjoyed had the marriage not dissolved, the court determined that $3,000 per month was adequate.  We see no abuse of discretion here.

It is clear from the record that the financial resources of respondent are considerable, and it is inferrable that they are more than ample to meet his needs.  750 ILCS 5/505(a)(2)(e) (West 2000).  In 1999, respondent earned nearly $500,000, and he was on a pace to exceed that figure in 2000.  Further, given respondent's considerable income, it is also inferrable that respondent's son would have enjoyed a high standard of living had the marriage not dissolved.  750 ILCS 5/505(a)(2)(c) (West 2000).  The resources of petitioner, conversely, are much smaller.  750 ILCS 5/505(a)(2)(b) (West 2000).  

Regarding the needs of petitioner and her son (750 ILCS 5/505(a)(2)(a), (a)(2)(b) (West 2000)), respondent points out that petitioner has submitted an affidavit outlining her monthly expenses, which included expenditures for petitioner's live-in boyfriend.  The boyfriend does contribute $530 monthly toward household expenses.  Respondent complains that the amount of child support set by the trial court constitutes approximately 90% of petitioner's stated monthly expenses.  We first note that, assuming respondent is correct, the needs of the petitioner and her son are but two factors a court is directed to consider as part of a multipart, totality-of-the-circumstances test.  Other factors, as set forth in the preceding paragraph, militate for a significant award.  See 750 ILCS 5/505(a)(2) (West 2000).  Second, it is inferrable that, if the marriage had not dissolved, petitioner's son would have been enjoying a higher standard of living.  Had he been enjoying the same standard of living while residing with petitioner, it is apparent that the family's monthly expenses would have been higher.  A support award need not be limited to the shown needs of the child.  
In re Marriage of Lee
, 246 Ill. App. 3d 628, 643 (1993).

Respondent also poses the related question of "how many pagers, cell phones and cars does one child need?"  We will not assume that petitioner will spend all of the child support money on luxuries or frivolities.  In an incongruous fashion, respondent asks that we make this assumption about petitioner but complains bitterly because the trial court characterized his lifestyle as luxurious.  Outside of a $9,000 trip to Hawaii, there is little in the record concerning respondent's spending habits.  However, from his income alone, the trial court's finding that his life was one "without want" is clearly not contrary to the manifest weight of the evidence.  Respondent relies on 
In re Marriage of Bush
, 191 Ill. App. 3d 249, 261 (1989), for the proposition that courts are "not required to equate large incomes with lavish life-styles."  We have no quarrel with this proposition.  However, that a court is not required to draw such an inference says nothing regarding whether a court may do so.  Moreover, whether respondent leads a frugal lifestyle is only pertinent to half the inquiry set forth in section 505(a)(2)(e), which focuses on both the needs and resources of the noncustodial parent.  750 ILCS 5/505(a)(2)(e) (West 2000).  Even if respondent's needs are few, his resources are considerable.  In sum, assuming a frugal lifestyle for respondent is not sufficient to tip the balance in respondent's favor such that the trial court abused its discretion in setting child support.

Respondent also complains that child support is a joint obligation of both parents (
In re Marriage of Singleteary
, 293 Ill. App. 3d 25, 38 (1997)) and that the $3,000 monthly award places the burden solely on him.  In this argument, respondent again points out that the award constitutes about 90% of petitioner's household budget.  The 90% figure is based on petitioner's affidavit of monthly expenses.  As noted above, an award need not be limited to the shown needs of the child.  
Lee
, 246 Ill. App. 3d at 643.  Thus, the trial court was not limited to considering the expenses set forth in petitioner's affidavit in setting child support.

Accordingly, a reasonable person could agree with the trial court that a $3,000-per-month child-support award was appropriate.  Thus, the trial court did not abuse its discretion in fixing child support.  
Schwartz v. Cortelloni
, 177 Ill. 2d 166, 177 (1997).

C. Contempt

Respondent next contends that the trial court erred in finding him in indirect civil contempt for failing to tender W-2 forms to petitioner from 1994 to 1999.  Merely holding an individual in contempt is insufficient to confer this court with appellate jurisdiction over a contempt order.  
Vowell v. Pedersen
, 315 Ill. App. 3d 665, 666 (2000).  Before we can assume jurisdiction, the order must impose some sanction upon the appellant.  
Vowell
, 315 Ill. App. 3d at 666.  Accordingly, we lack jurisdiction over the contempt order, and we dismiss that portion of this appeal.  To the extent that the contempt finding is relevant to the issue of attorney fees, we will discuss the finding in the next section of this opinion.

D. Attorney Fees

Respondent further complains that the trial court erred in awarding petitioner $2,300 for attorney fees and costs.  He points out that the trial court found him to be in indirect civil contempt only for his "wilful 
and contemptuous failure to provide Petitioner with his W-2s or equivalent tax related documents each year."  He then contends that the trial court improperly awarded fees to petitioner for her motion to compel him to pay child support.  Respondent asserts that the trial court made no finding that his failure to pay support was "without compelling cause or justification," as required by section 508(b) of the Act.  750 ILCS 5/508(b) (West 2000).

Section 508(b) of the Act provides that "[i]n every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party."  750 ILCS 5/508(b) (West 2000).  When a court determines that a party's failure to comply with a child-support order is without compelling cause or justification, an award of fees and costs under section 508(b) is mandatory.  
In re Parentage of M.C.B.
, 324 Ill. App. 3d 1, 4 (2001).  A finding of contempt is sufficient to require an award of fees under this provision, but such a finding is not necessary.  
In re Marriage of Davis
, 292 Ill. App. 3d 802, 811 (1997).  The party that fails to comply with an order bears the burden of proving that compelling cause or justification for the noncompliance exists.  
In re Marriage of McGuire
, 305 Ill. App. 3d 474, 481 (1999).

We first conclude that the trial court properly found respondent to be in indirect civil contempt.  The trial court found that the parties' marital settlement agreement required respondent to provide petitioner with "a document categorically equivalent to a W-2 statement, some tax-related statement that was generated specifically for the purpose of reporting income information to the IRS."  The court then found that the summaries generated at Krughoff did not meet these standards.  In pertinent part, the parties' marital settlement agreement provided as follows: "For verification purposes, father shall provide mother with copies of W-2 forms or other tax related statements indicating the bonus he has received on or before January 31st of every calendar year for the preceding calendar year."

Marital settlement agreements are contracts and subject to the same rules of construction as is applied to any contract.  
In re Marriage of Agustsson
, 223 Ill. App. 3d 510, 518 (1992).  The primary goal in construing a settlement agreement is to ascertain the intent of the parties.  
Agustsson
, 223 Ill. App. 3d at 518.  Contract interpretation presents a question of law, which we review 
de novo
.  
In re Shaffer
, 319 Ill. App. 3d 1048, 1051 (2001).  A contract's language must be given its plain and ordinary meaning if possible.  
Owens v. McDermott, Will & Emery
, 316 Ill. App. 3d 340, 344 (2000).  
A court must consider the contract as a whole, rather than focusing upon isolated portions.  
Spectramed Inc. v. Gould Inc.
, 304 Ill. App. 3d 762, 770 (1998).

Respondent's argument focuses upon the portion of the agreement that states that he must provide "W-2 forms or other tax related statements."  He contends that "other tax related statements" encompasses the type of document he provided to petitioner.  Read in isolation, respondent's argument might be persuasive.  However, we note that the sentence in which "other tax related statements" appears is prefaced by the clause "[f]or verification purposes."  Reading these two phrases in conjunction, it is apparent that the type of document contemplated was one that would substantiate respondent's statements regarding the size of his bonuses and the amounts to which petitioner was entitled.  "Verification" implies something more substantial and objective than a company-produced summary of respondent's bonuses.  Thus, we agree with the trial court's determination that the settlement agreement called for something in the nature of a W-2 form.

Respondent also argues that petitioner's failure to pursue the production of his W-2 forms from 1994 to 1999 precludes a contempt finding.  First, we note that petitioner testified that she repeatedly requested that respondent tender to her his W-2 forms.  Respondent denied that these requests were made.  Resolving conflicts in evidence is a matter for the trier of fact.  
Williams
, 258 Ill. App. 3d at 825.  Further, as the trial court observed, the settlement agreement states that respondent "shall" turn over such documents to petitioner.  "Shall" connotes a mandatory obligation.  
Professional Executive Center v. La Salle National Bank
, 211 Ill. App. 3d 368, 379 (1991).  Hence, whether petitioner sought the production of the forms is irrelevant.  In sum, we find an ample basis for the trial court's finding that respondent was in contempt.

Respondent also points out that the trial court's contempt finding only pertained to his failure to tender his W-2 forms to petitioner.  However, in awarding petitioner $2,300 for fees and costs, the court stated that it "considered the relevant factors pursuant to section 503(j) and 508(b)" of the Act.  The only two relevant factors listed in section 508(b) are whether a party's noncompliance is without compelling cause or justification.  
750 ILCS 5/508(b) (West 2000).  The court also stated that it had reviewed petitioner's petitions that sought contribution for attorney fees.  The petitions sought fees beyond those incurred in obtaining respondent's W-2 forms.  Thus, it is apparent that the court determined respondent's failure to pay child support was without compelling cause or justification.  The court did not explicitly include this language in its order; however, such a finding is clearly implicit in its order.  This is sufficient to justify the award.  
Cf.
 
In re Marriage of Frederick
, 218 Ill. App. 3d 533, 543 (1991) (holding that a trial court is not required to make explicit findings regarding each factor set forth in section 504(b) of the Act); 
In re Custody of Blonsky
,  84 Ill. App. 3d 810, 820 (1980) ("It is manifest from our review of the trial testimony that the court was presented with testimony relating to these factors. The fact that the court did not explicitly explore its conclusions as to each factor in issuing its order does not establish that the criteria were not utilized").

We further note that, since respondent bore the burden of proving that his noncompliance was without compelling cause or justification (
McGuire
, 305 Ill. App. 3d at 481), the lack of an explicit finding would appear to favor petitioner rather than respondent.  Moreover, there is adequate evidence in the record to support a finding that respondent's noncompliance was without compelling cause or justification.  
750 ILCS 5/508(b) (West 2000).  Aside from failing to turn over his W-2 forms, respondent secreted his June 1999 bonus from petitioner.  Further, after unilaterally determining that he was entitled to deduct what he termed mandatory loans to Krughoff, he had two bonus checks issued in an apparent attempt to conceal the fact that he was taking this deduction.  Respondent accelerated bonus income into weekly pay, which had the effect of concealing these earnings from petitioner and allowed respondent to issue petitioner a smaller bonus child-support check in January.  In short, respondent engaged in an extensive scheme to prevent petitioner from receiving that to which respondent agreed petitioner was entitled in the marital settlement agreement.  We find respondent's conduct reprehensible, and we also find abundant evidence in the record to support an award of $2,300 under section 508(b) of the Act.

E. The Stay

Respondent finally argues that the trial court erred in not staying the  enforcement of its judgment for the support arrearage pending the current appeal.  Respondent did offer to post an appeal bond.  The trial court found respondent's request foreclosed by section 413(a) of the Act.  
750 ILCS 5/413(a) (West 2000).  This section provides, in pertinent part, that "[a]n order directing payment of money for support or maintenance of the spouse or the minor child or children shall not be suspended or the enforcement thereof stayed pending the appeal."  750 ILCS 5/413(a) (West 2000).

Respondent makes a policy argument, asserting that, where a judgment is for an arrearage and where the child in question is receiving current child support, there is no compelling reason that a judgment for an arrearage should not be stayed.  While this may be persuasive, no distinction is made in section 413(a) between current support and arrearages.  Such considerations would be more properly directed to the legislature.

Respondent also argues that section 413(a), by its own terms, applies to orders as opposed to judgments.  He observes that section 505(d) of the Act provides that "[a]ny new or existing child support order entered by the court under this Section shall be deemed to be a series of judgments against the person obligated to pay support thereunder."  750 ILCS 5/505(d) (West 2000).  Section 505(d) also provides that "[e]ach such judgment shall have the full force, effect and attributes of any other judgment of this State, including the ability to be enforced."  750 ILCS 5/505(d) (West 2000).  Respondent then reasons that by virtue of section 505(d) the court's support order is a judgment.  Since section  413(a) mentions only orders, respondent concludes, it does not bar the stay of the order for the arrearage pending appeal.  We find respondent's reasoning unpersuasive.  Statutory construction presents a question of law, which we review 
de novo
.  
Miller v. Penrod
, 326 Ill. App. 3d 594, 596 (2001).

Respondent's interpretation of these sections leaves the portion of section 413(a) at issue here completely without effect.  Section 505(d) applies to "[a]ny new or existing support order."  750 ILCS 5/505(d) (West 2000).  Thus, if we were to accept respondent's reasoning, all support orders would fall outside the ambit of section 413(a), and the otherwise plain meaning of section 413(a) would be obliterated.  See 
Primeco Personal Communications, L.P. v. Illinois Commerce Comm'n
, 196 Ill. 2d 70, 91 (2001).  We will not interpret a statute, or in this case pair of statutes, such that any portion of the statute is rendered meaningless.  
Primeco Personal Communications, L.P.
, 196 Ill. 2d at 91.  Accordingly, we must reject respondent's argument.  See also 
In re Marriage of Petersen
, 319 Ill. App. 3d 325, 343-44 (2001).

III. CONCLUSION

In light of the foregoing, we modify the judgment of the trial court to reflect a child-support arrearage of $76,672.57.  We dismiss the appeal insofar as it pertains to the contempt order.  In all other aspects, we affirm.

Dismissed in part and affirmed as modified in part.

KAPALA, J., concurs. 

PRESIDING JUSTICE HUTCHINSON, specially concurring:

I write separately in this case to address the majority's finding that the trial court properly found the respondent to be in indirect civil contempt.  This specific finding in the section of the disposition addressing the award of attorney fees is improper in light of the majority's earlier conclusion that no appellate jurisdiction existed concerning the contempt issue.

"The question of jurisdiction of the appellate court must be determined prior to deciding the merits of an appeal."  
Steel City Bank v. Village of Orland Hills
, 224 Ill. App. 3d 412, 416 (1991).  Once an appellate court determines that jurisdiction does not exist on any given issue, the appeal as it relates to that issue must be dismissed.  
Steel City Bank
, 224 Ill. App. 3d at 416.  Furthermore, Illinois courts lack jurisdiction to render advisory opinions.  
People ex rel. Black v. Dukes
, 96 Ill. 2d 273, 276-77 (1983).

In this case, the majority properly dismissed the respondent's appeal as it related to the finding of contempt.  Without the imposition of a penalty and the opportunity to purge the contempt, no final, appealable order existed. See 
Vowell v. Pedersen
, 315 Ill. App. 3d 665, 666 (2000).  The majority indicated that, to the extent the contempt finding was relevant to the issue of attorney fees, the matter would be addressed in that context.  While I agree that a review of an award of attorney fees pursuant to section 508(b) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/508(b) (West 2000)) requires that this court consider the trial court's reasons for determining that the respondent's failure to comply with an order or judgment was without compelling cause or justification, this court does not need to and should not extend that review to the ultimate finding of contempt when this court lacks jurisdiction on the issue of contempt.

 Respondent clearly chose to heed the advice from third parties about his child support reporting and payment obligations rather than follow the trial court's unambiguous judgment dissolving the marriage between petitioner and respondent.  To make matters worse for respondent, the trial court's judgment incorporated the marital settlement agreement that he signed and acknowledged, presumably in good faith and conscience for the welfare of his children.  His deliberate disregard for his agreement, which was incorporated into the judgment of dissolution entered by the trial court, required that petitioner intercede to enforce respondent's reporting and payment obligations.  That intercession was costly.  Section 508(b) mandates the reimbursement of reasonable attorney fees and costs to the prevailing party when the failure to comply with an order or judgment is without compelling cause or justification.  A finding of "contempt" is not a necessary condition precedent to an award of attorney fees pursuant to section 508(b).  See 
In re Marriage of Gattone
, 317 Ill. App. 3d 346, 359 (2000) (requiring only that a trial court find that a party violated a court order "without compelling cause or justification" before awarding attorney fees as a sanction). 

Accordingly, I agree with the majority's decision to affirm as modified the award of child support, to affirm the award of attorney fees, and to dismiss the respondent's appeal of his contempt finding.  But, because we lack jurisdiction to consider the issue of respondent's contempt and we are without authority to render what would effectively be an advisory opinion, I cannot agree with the majority's use of respondent's contempt finding to justify, in part,
 the award of attorney fees.