*In re* MARRIAGE OF BARBARA J. GUERRA, Petitioner-Appellee, and JOHN GUERRA, Respondent-Appellant.

Second District    No. 86—0077

Opinion filed March 13, 1987.—Rehearing denied April 15, 1987.

Thomas J. Leahy and Joseph Gottemoller, both of Franz, Naughton & Leahy, of Crystal Lake, and Robert O. Kuehn, of Williston, McGibbon & Kuehn, of Barrington, for appellant.

Edward M. Burns and H. Joseph Gitlin, both of Gitlin & Burns, of Woodstock, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

After a bench trial, the court found that certain property purchased by the husband during the marriage was marital property and awarded some of that property to the wife. The husband appeals this

award and the award of the wife's maintenance. We reverse.

On February 25, 1985, John Guerra (John) and Barbara Guerra (Barbara) were divorced. This was John's fourth marriage, and it was Barbara's second marriage. The parties had been married less than nine years. John had four children by his previous marriages; Barbara had five children. The parties' current marriage produced one child, Nicola, born June 6, 1977. John was a full-time employee, stockholder, and officer of Executive Aircraft Maintenance Corp. (EAMC), a company which he had founded in April 1956. At the time of their marriage, his assets consisted of his EAMC stock and some personal items. He never put Barbara's name on his EAMC stock.

Barbara brought into the marriage a house and certificates of deposit which, together, had a value of $55,000. In addition to this she received, throughout the marriage, a widow's pension from the plumber's union and social security payments for her children totalling approximately $95,000. Barbara kept ownership of these assets in her own name and received the proceeds and earnings therefrom. Eventually she liquidated her property. The sale proceeds of the property and her pension and social security benefits were used to pay for the family's living expenses.

The parties resided on EAMC property throughout their marriage until they moved to the Swarthmore residence in December 1980. While they lived on the airport property, EAMC paid for the mortgage on the property, some auto repairs, improvements to the house, gasoline for their automobiles, their utility bills and insurance.

During almost the entire marriage, the parties each used and controlled separate checking and bank accounts. John used and controlled the accounts referred to in the parties' trial court stipulation as the "blue" accounts; Barbara used and controlled the accounts referred to as the "pink" accounts. Both parties' names were on all of the accounts up till and after the parties' marital problems culminated in April 1983. His name was printed on his checks; her name was on her checks. She testified that she deposited her social security checks into the account that she was using. She also assumed that John was depositing his money from the airport sale into the account he was using. Barbara would write checks on the "blue" account only when John would give her a check and instruct her to write it for a specific purpose. John never wrote checks on the "pink" account. He testified that Barbara never tried to withdraw money from his "blue" account. Further, Barbara testified that John always carried his checkbook for his accounts,; while she carried her checkbook for her accounts. One of the "blue" accounts used by John had Barbara's name on it, not as

joint tenant, but with power of attorney to sign.

In 1981, John liquidated EAMC, and the proceeds of the sale were paid (and are payable) pursuant to an installment note. As John received his share of the installment payments, he deposited them into his "blue" account, using the account as a temporary repository. With these stock proceeds he purchased other assets, always in his name alone, and always using his "blue" accounts for these purchases. He stated that the only reason he deposited his airport stock proceeds into his "blue" account was so that he would have a place to put them so he could write checks to make other purchases. These deposits and purchases were made pursuant to his preconceived plan of exchanging his premarital airport stock for other similar nonmarital assets.

The parties otherwise separated their financial affairs and dealt at arm's length. Barbara testified that she always maintained her premarital certificates of deposit in her separate name throughout the marriage. Her interest checks from those certificates were payable to her. Both parties testified as to Barbara's controlling the investment of the certificates and the interest from them.

Barbara also testified that she made two loans to the airport. These were repaid with interest, except for approximately $4,000 which John testified was used to pay interest on the joint loan of the parties for the purchase of another property. Barbara was given promissory notes in exchange for the loans she gave. John testified that he was always able to obtain outside financing for EAMC, but he offered Barbara the chance to make greater amounts of interest from these loans to EAMC. She also used her certificates of deposit as collateral for EAMC loans. These were returned to her, and none of the principal was used in connection with the collateralization. She received interest on them even while they were put up as security for the loan.

John offered evidence of gifts which he made to Barbara. He testified that when he intended to make a gift, he made it. The record reflects that he made a gift of a car to Barbara in March of 1981, and titled that car in her name alone. He made other gifts to her, including a trip to Tonga. Further, he set up a Clifford trust to benefit her children from her first marriage. Likewise, his will specifically provided that Barbara would receive the Swarthmore residence after his death.

The court found that certain property, designated in the stipulation as nonmarital assets, was John's nonmarital property. This finding was not appealed by Barbara. The trial court also found that of

the approximately $2 million in proceeds from the sale of EAMC, $891,514, or 44%, was tainted. The tainted assets were those purchased by John in his name alone, but which were purchased through the "blue" accounts which had Barbara's name on them as a joint tenant. The court determined that John had failed to rebut by clear and convincing evidence the presumption of marital property as to the funds transferred into joint tenancy bank accounts. The assets included pieces of property known as the Swarthmore house and the Rickert Road property, various stocks and bonds, certificates of deposit, several vehicles, and a Clifford trust. These are the only assets which are in issue in this appeal.

The judge awarded some of that property (the Swarthmore residence valued at $275,000 and the $150,000 worth of certificates of deposit and interest) to Barbara as her just portion of the marital property. The remainder he awarded to John. The court also found that Barbara lacked sufficient property to provide for her reasonable needs, that she is unable to support herself through appropriate employment at this time, and is otherwise without sufficient income. The court therefore awarded her maintenance from John in the sum of $4,000 per month for 73 months. This award would terminate in the event of her death or remarriage.

A judgment of dissolution of marriage was entered on October 4, 1985. John filed a timely post-trial motion seeking to vacate the ruling as to the tainted property and the award of maintenance. The court denied the motion on January 10, 1986. John's notice of appeal was timely filed on January 24, 1986.

John argues that (1) the trial court erred in finding that he did not overcome the presumption that the tainted assets were marital property, and (2) the maintenance award is against the manifest weight of the evidence. He first argues that the presumption that the tainted property is marital property because it was acquired after the marriage is overcome by a showing that the property was acquired in exchange for property acquired before the marriage. After overcoming this hurdle, he contends that there was no evidence which showed that the property was a gift to the marital estate. Indeed, he claims the evidence was clearly to the contrary.

Barbara, on the other hand, responds that the trial court's finding that John failed to rebut the statutory and common law presumptions that the tainted assets were marital property is supported by the evidence and was made in accordance with the law. She maintains that John's nonmarital property became marital when it was commingled with marital property in the joint tenancy bank account since John

never overcame the presumption that the bank account itself was a gift to her when it was created. She claims John did not show that he had not intended to create a true joint tenancy at the time the joint accounts in issue were created. She cites *Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 591-92, for the proposition that it is the intent of the creator at the time the joint tenancy was created that is relevant in determining whether a gift was intended. Therefore, none of the tainted assets which were acquired in exchange for John's nonmarital property can overcome the statutory presumption of marital property.

Section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1983, ch. 40, par. 503(a)) defines marital property as "all property acquired by either spouse subsequent to the marriage." For purposes of distribution of property, all property acquired by either spouse after the marriage and before a judgment of dissolution "is presumed to be marital property." (Ill. Rev. Stat. 1983, ch. 40, par. 503(b).) Section 503(b) goes on to state: "The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section." (Ill. Rev. Stat. 1983, ch. 40, par. 503(b).) Section 503(a) excepts certain property known as nonmarital property where the "property [was] acquired in exchange for property acquired before the marriage." Ill. Rev. Stat. 1983, ch. 40, par. 503(a)(2).

John relies on the stipulation and trial testimony to show that the tainted property was acquired in exchange for his nonmarital airport stock. With this, we agree. However, since John commingled his nonmarital stock proceeds with marital funds when he disbursed them through the joint checking account, our review must be extended to section 503 of the Act (Ill. Rev. Stat. 1983, ch. 40, par. 503). Section 503(c)(1) provides that when marital and nonmarital property are commingled, resulting in a loss of identity of the nonmarital estate, the commingled property is transmuted into marital property. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(1); *In re Marriage of Guntren* (1986), 141 Ill. App. 3d 1, 6.) Pursuant to section 503(c)(2), the estate which contributes assets shall be reimbursed from the estate receiving the contribution. Therefore, "if nonmarital property is transmuted into marital property, the party contributing the nonmarital property is entitled to reimbursement of the value of such property provided: (1) the contribution is traceable by clear and convincing evidence; and (2) the contributor did not make a gift of the nonmarital property to the marital estate." (141 Ill. App. 3d 1, 6; see also *In re Marriage of Thornton* (1985), 138 Ill. App. 3d 906, 918-19.) As we have just stated, the re-

quirement that the contribution is traceable by clear and convincing evidence is satisfied by the parties' stipulation and the trial court testimony. An examination of this second requirement will therefore be dispositive of this issue.

■■ There are several factors to consider in determining whether a party has rebutted the presumption of gift or has shown that presumption to be unreasonable. Among these factors are (1) the size of the gift relative to the entire estate (see *Coates v. Coates* (1978), 64 Ill. App. 3d 914, 917; see also *In re Estate of Guzak* (1979), 69 Ill. App. 3d 552, 555); (2) who paid the purchase price, made improvements, and paid taxes for the property with solely acquired funds and exercised control and management over the property (see *In re Marriage of Wojcicki* (1982), 109 Ill. App. 3d 569; *Coates v. Coates* (1978), 64 Ill. App. 3d 914); (3) when the assets were purchased (see *In re Marriage of Simmons* (1981), 101 Ill. App. 3d 645 (where the court found that any presumption of gift that arose by virtue of the wife's paying joint marital debts with her nonmarital funds was overcome since her payment occurred after the parties separated)); and (4) how the parties handled their prior financial dealings with each other (see *In re Marriage of Emken* (1981), 86 Ill. 2d 164; *In re Marriage of Rogers* (1981), 85 Ill. 2d 217; *In re Marriage of Rink* (1985), 136 Ill. App. 3d 252).

■■ Our examination of the record convinces us that John has rebutted the presumption of gift with clear, convincing, and unmistakable evidence. John kept the nonmarital airport stock separate after the marriage. The stock was his only asset when he married Barbara in 1976; he acquired it in 1955 and owned it until the sale in 1981. From 1955 to 1981 the airport corporation was the continuous source of his employment and livelihood. Barbara's testimony agrees. The assets which were acquired in exchange for the nonmarital airport stock were all titled in John's name alone.

An examination of some of the individual assets confirms this. With regard to the Swarthmore residence, we note that the title of the residence was placed in a land trust by John upon purchase. He is the sole beneficiary. Barbara's name was never on the title, nor was she a beneficiary. She testified that she neither found the house nor attended the closing. While she did sign the note for the earnest money, this fact is not sufficient to transmute the property into marital property. (See *In re Marriage of Drennan* (1981), 93 Ill. App. 3d 903, 906-07.) In any event, she did not pay any monies toward this note. John paid it with airport stock proceeds which went through one of his "blue" accounts.

John received EAMC stock proceeds on April 2, 1981, which he deposited in his "blue" joint account. The next day, he withdrew the

necessary sums to pay for the residence. Barbara testified that John paid all household expenses in connection with the Swarthmore residence with his checks and from his accounts. She testified that John paid the utilities, taxes, and insurance and for the addition to the home. These facts are a significant indication that John's real intention was not to make a gift of the residence, but to have it retain its nonmarital character. (See *Coates v. Coates* (1978), 64 Ill. App. 3d 914; *In re Marriage of Wojcicki* (1982), 109 Ill. App. 3d 569.) Moreover, we consider John's will, which was signed on February 8, 1982. This was prior to the parties' marital problems in April 1983 and before the failure of counseling in September 1983. It corroborates his intention to keep the Swarthmore residence as his separate property. Barbara would receive the property only after his death.

Concerning the Rickert Road property, we note that it was purchased on October 3, 1983, well after the times Barbara testified the marital problems came to a head. The trial stipulation reflects that during the end of April 1983, John made large airport proceeds deposits into the joint account prior to purchasing the Rickert property. Barbara testified that the purchase of this property took place after "things had come to a head," while the parties were in counseling and things were looking worse and worse. She stopped wearing her wedding ring in August or September of 1983, and she realized that the parties would not be getting back together. The record establishes that the parties separated in September 1983. See *In re Marriage of Simmons* (1981), 101 Ill. App. 3d 645.

Finally, we consider the Clifford trust fund. John set this fund up also using his "blue" account. The stipulation shows that the monies to fund the trust came from the airport stock proceeds. Barbara testified that John set up the trust in part for the tax benefit; she knew about the trust only from what he told her; it was his decision to set up the trust; she did not sign the trust documents; and when the trust serves its purpose, the money will go back to John.

In examining the financial dealings of the parties, we observe that they used and controlled separate bank accounts. Contrary to the maintenance of one marital account, as appears in cases like *In re Marriage of Emken* (1981), 86 Ill. 2d 164, John and Barbara controlled and used separate bank accounts. John never wrote checks on the "pink" accounts. John testified that Barbara never tried to withdraw money from his "blue" account. Further, Barbara testified that John always carried his checkbook for his accounts, while she carried her checkbook for her accounts. His name was printed on his checks; her name was on her checks. She deposited her social security checks into

the account that she was using. She also assumed that John was depositing his money from the airport sale into the account he was using. Barbara maintained her premarital certificates of deposit in her separate name throughout the marriage. Her interest checks from those certificates were payable to her. She also made two loans to the airport which were repaid by John, with interest, from his "blue" joint account. These factors tend to support the conclusion that no gift was intended. See *In re Marriage of Rink* (1985), 136 Ill. App. 3d 252 (wherein the husband was awarded as his nonmarital property funds which had previous to the dissolution proceedings been held in joint accounts between the spouses, the court finding the following facts relevant to this determination: the husband testified that he established the account in joint tenancy for the sake of convenience; he never intended to give an ownership interest in the accounts to his wife; he never allowed his wife to make a withdrawal; and she did not have access to the passbooks); see also *In re Estate of Guzak* (1979), 69 Ill. App. 3d 552 (where the court considered the following factors in determining whether a donor actually intended to transfer interest in a joint tenancy bank account held by a father and son: the fact that the transfer of personal property into the joint account was made for the mere convenience of the creator of the account; the quantity of personal property involved in comparison to the total assets of the estate; the retention of the exclusive possession of the passbook of the joint account; whether all of the money deposited in the account belonged to the donor and whether the donee considered himself as having any ownership in the account).

Finally, we consider the size of the tainted assets in relation to the total nonmarital estate which John had acquired. The total stipulated value of the assets purchased from his sale of EAMC stock is $2,015,864, of which $891,514, or 44%, was classified as marital by the trial court. While this is certainly not a gift of John's entire nonmarital estate (see *Scanlon v. Scanlon* (1955), 6 Ill. 2d 224, 231; *Coates v. Coates* (1978), 64 Ill. App. 3d 914, 915), we do not feel it reasonable to presume he intended a gift of 44% of his estate to this, his fourth marital partner, when he did not at any time previously indicate any intention to gift his stock to any of his previous wives and in view of the fact that he has two children from his first marriage, two from his second, and one from his fourth.

Based on the foregoing, we conclude that John rebutted the gift presumption. Further, nothing which Barbara testified to disputes it. Barbara's argument rests upon her contention that, pursuant to *Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587,

591-92, unless John is able to demonstrate that he was not intending to create a true joint tenancy bank account when the "blue" accounts were established, he cannot rebut the presumption that any property which was acquired through these accounts is marital. This focus misses the mark. The parties have not tendered, nor have we found, any property-disposition cases where *Murgic* has been so applied. *Murgic* was a case where a surviving joint tenant brought an action against a depository bank for the proceeds of a savings account held in his name and as a joint tenant. The object of the action was the proceeds of the joint account. It was for this reason that the court focused on the intent of the party who created the account. In the instant case, the joint account is merely a conduit through which John disbursed his nonmarital assets. It is his intention at the time that the property is converted into property held by them as joint tenants which is controlling *vis-a-vis* the status of the property. (See *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 205.) Were it otherwise, it would be incredibly difficult for any party to rebut the marital presumption of gift where property has been exchanged via any joint tenancy account. (See *In re Marriage of Olson* (1983), 96 Ill. 2d 432, 440.) Barbara's argument therefore fails.

■ John's appeal also challenges the amount of the trial court's maintenance award. In light of our resolution of the first issue, we need not address this issue. (See *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 778 (where court remands cause for reapportionment of marital property, the issues of maintenance and child support need be readdressed by the trial court since they depend so heavily upon the apportionment of property).) The trial court's judgment found that Barbara lacked sufficient property, including marital property apportioned to her, to provide for her reasonable needs and is unable to support herself through appropriate employment at this time or is otherwise without sufficient income. Counsel for defendant conceded at oral argument that maintenance is warranted. We agree. The trial court is directed to redetermine the amount of maintenance and child support in accordance with sections 504 and 505 of the Act (Ill. Rev. Stat. 1985, ch. 40, pars. 504, 505).

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

WOODWARD and REINHARD, JJ., concur.