2016 IL App (2d) 150160
No. 2-15-0160
Opinion filed June 27, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF CATHY ASTA, | ) ) ) | Appeal from the Circuit Court of Lake County. |
|     Petitioner-Appellant and     Cross-Appellee, | ) ) ) | |
| and | ) ) | No. 10-D-1489 |
| JAMES A. PAPPAS, | ) ) ) | Honorable |
|     Respondent-Appellee and     Cross-Appellant. | ) ) | Charles D. Johnson Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hutchinson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1 Petitioner, Cathy Asta, and respondent, James A. Pappas, were married in April 1999. They have no children together. On November 22, 2010, Cathy petitioned to dissolve the marriage. The matter proceeded to trial in August 2014 regarding the distribution of property. The parties significantly narrowed the issues at trial by stipulating to numerous uncontested facts and agreeing to the admission into evidence of hundreds of exhibits. The central dispute between the parties was the proper classification of certain stock that Cathy had acquired during the marriage. Cathy contended that the stock was her nonmarital property because she received it as an inheritance. James argued that Cathy did not sustain her burden of proving that she

inherited the stock. The trial court agreed with James and found that the stock was marital property. Cathy appeals both the classification of the stock and the ultimate disposition of marital property. In his cross-appeal, James argues that he should have been awarded a greater portion of the marital estate. For the reasons that follow, we reverse and remand for further proceedings consistent with this opinion.

¶ 2                                    I. BACKGROUND

¶ 3     In 1967, August Asta (Cathy's father) and two other men founded the company that became known as Olsun Electrics Corporation (Olsun). August later came to own all 150 shares of Olsun stock. He also came to own all 1,000 shares of Olsun Electrics Corporation of Wisconsin (Olsun Wisconsin), an affiliated company that was incorporated in 1994. Cathy ultimately acquired a 100% interest in both companies in December 2005, more than nine years after August died, through a complicated transaction among the Asta family, which we will detail below. Although Olsun Wisconsin is no longer in business, at the time of the trial in these dissolution proceedings, the 150 shares of Olsun stock were worth $7,820,000. In order to understand the parties' respective arguments as to whether the Olsun stock is marital property, it is necessary to explain August's estate plan as well as the December 2005 transaction.

¶ 4     In his will, executed on October 10, 1989, August left his personal effects to his ex-wife, Mary Jane Asta (Cathy's mother), who was to serve as executor. The residuary estate was to pass to the August F. Asta Revocable Trust, u/a/d October 10, 1989 (the AFA Trust). August designated himself as the trustee and listed Mary Jane as the successor trustee. Under the terms of the AFA Trust, upon August's death, any property not used for the payment of debts, taxes, and expenses would be allocated to a residuary trust. Mary Jane was a beneficiary of the residuary trust, as were August's descendants (ultimately, Cathy and her two brothers, Anthony

Asta and John Asta). Mary Jane was to receive all of the net income from the residuary trust during her lifetime. With respect to the distribution of principal from the residuary trust, the AFA Trust provided:

"The Trustee is hereby authorized to distribute to any one or more of the beneficiaries of the Residuary Trust, at any time and from time to time during their lifetimes, all or as much of the principal of such trust as the Trustee deems to be in the best interests of said beneficiaries; provided, however, that the Trustee shall only make such distributions as the Trustee deems necessary for the support of Mary Jane Asta during her lifetime."

Additionally, the AFA Trust stated:

"Upon the death of the Grantor, or upon MARY JANE ASTA's death, whichever date shall later occur, the Trustee shall distribute any unappointed portion of the then remaining trust estate of the Residuary Trust in separate shares per stirpes to the descendants of the Grantor who shall be living on such date ***. Each such share distributable to a descendant of the Grantor shall be retained in trust by the Trustee, as a separate trust, of which the descendant of the Grantor, for whom such share shall have been allocated[,] shall be a beneficiary ***."

The AFA Trust then established the terms of the "descendant's trusts." Among those terms was the right for a beneficiary to withdraw the entire balance of the trust principal once he or she turned 45 years old.

¶ 5    August also established the Asta Real Estate Trust, u/a/d December 24, 1992 (the Real Estate Trust), designating himself and his son Anthony as co-trustees. The corpus of the Real Estate Trust included a 100% beneficial interest in a land trust. That land trust, in turn, owned a property located at 10901 Commercial Street in Richmond, Illinois (the Commercial Street

property), where Olsun operated. The Real Estate Trust was for the benefit of August's children: Cathy, Anthony, and John. During August's lifetime, the trustees were authorized to distribute all or any portion of income or principal to the beneficiaries. Upon August's death, the remaining trust estate would be distributed *per stirpes* to separate children's trusts. Cathy, Anthony, and John would serve as trustees of their respective real estate subtrusts.

¶ 6     When August died in September 1996, both the 150 shares of Olsun stock and the 1,000 shares of Olsun Wisconsin stock were titled in his name. Shortly thereafter, Mary Jane designated Anthony as co-trustee of the AFA Trust. In May 1997, August's will was admitted to probate and letters of office were issued to Mary Jane as independent executor. The family faced a substantial estate-tax liability and elected to make payments to the Internal Revenue Service in installments pursuant to section 6166 of the Internal Revenue Code (26 U.S.C. § 6166 (2012)). Accordingly, the probate estate remained open for more than nine years, and the Olsun and Olsun Wisconsin stock was not actually transferred into the AFA Trust pursuant to the pourover will until 2005.

¶ 7     Anthony apparently ran the family businesses for a number of years after August died. It seems that, during that time, Mary Jane, Cathy, and John had less direct involvement, if any, with business operations. In early 2005, discord within the Asta family came to a head over Mary Jane's alleged mismanagement of both the AFA Trust and the probate estate. John and Anthony contended that Mary Jane had made excessive withdrawals for her own benefit to the detriment of her children. On January 18, 2005, John filed a "Verified Petition to Remove the Executor, For Accounting, Recoupment, and Other Relief." Two months later, Anthony filed a "Verified Petition for Temporary Restraining Order, Injunctive Relief, Removal of Executor and Trustee, and For Other Relief."

¶ 8    Mary Jane, Cathy, Anthony, and John negotiated a settlement agreement, which was signed on November 15, 2005, and subsequently amended ("the settlement agreement"). We will describe only those terms of the settlement agreement that are directly relevant to the present appeal. The settlement agreement referenced the pending probate litigation as well as a lawsuit filed in the circuit court of McHenry County by Olsun and Olsun Wisconsin against Anthony and John for conspiracy and breach of fiduciary duties. The settlement agreement contained certain provisions regarding the AFA Trust. Specifically, Olsun and Olsun Wisconsin guaranteed Mary Jane employment for life at an annual salary of $150,000. In exchange, Mary Jane waived her interest in the AFA Trust. Contingent upon financing, Cathy agreed to "purchase" from the AFA Trust all of the stock of Olsun and Olsun Wisconsin for $2 million. It was agreed that Olsun and Olsun Wisconsin could participate as borrowers to finance this transaction. The AFA Trust would distribute $2 million to Anthony's subtrust and $2,117,000 to John's subtrust (the record does not explain the disparity in these distributions). The balance of the AFA Trust would then be distributed to Cathy's subtrust under the AFA Trust, which would be treated as the residuary beneficiary for tax purposes.

¶ 9    The settlement agreement also contained provisions pertaining to the Real Estate Trust. Specifically, that trust would borrow at least $1,217,000 from a bank, and the loan would be secured by mortgaging the Commercial Street property (recall that the corpus of the Real Estate Trust included a 100% interest in a land trust that held title to the Commercial Street property, where Olsun did business). The Real Estate Trust would then distribute $550,000 to Anthony's real estate subtrust and $550,000 to John's subtrust. The Real Estate Trust would simultaneously (1) convey to Cathy's real estate subtrust, subject to any mortgage, 100% of the beneficial interest in the land trust holding title to the Commercial Street property and (2) distribute any

remaining funds in the Real Estate Trust to Cathy's real estate subtrust, which would be treated for tax purposes as the residuary beneficiary. This arrangement was contingent upon the Real Estate Trust procuring the necessary financing, and once again Olsun and Olsun Wisconsin were permitted to serve as borrowers.

¶ 10 The terms of the settlement agreement were effectuated on December 13, 2005, as a single transaction, whereby Cathy acquired 100% interests in both Olsun (150 shares) and Olsun Wisconsin (1,000 shares). The transaction was funded by more than $3.6 million in cash from August's estate and the AFA Trust, a $1,750,000 revolving loan to Olsun, a $533,500 term loan to Olsun, and a $1,740,000 mortgage loan to the corporate trustee of the land trust. First DuPage Bank was the lender for each of the three loans. Among the security for the loans were: all of the property of both Olsun and Olsun Wisconsin (along with Cathy's newly-acquired interests in those companies), a $1 million life insurance policy on Cathy's life, and three real properties that were titled to Cathy individually. Both Cathy and James signed as mortgagors with respect to the personal real estate. Each mortgage contained the following language:

> "Notwithstanding anything to the contrary contained herein, J. Pappas is joining in this Mortgage solely to pledge his interest in the premises securing the Obligations. J. Pappas hereby expressly releases and waives any and all rights and benefits relating to himself and the premises under and by virtue of the Homestead Exemption Laws of the State of Illinois."

First DuPage Bank also required Cathy and James to guaranty the loans. Trial testimony suggested that the parties' guaranties were a tertiary form of repayment after the businesses' cash flows and the liquidation of business assets.

¶ 11    Cathy has served as president of Olsun since she acquired the company in December 2005. James served as chief operating officer from 2005 until he was placed on paid leave in May 2010. His employment was terminated in December 2011, during the pendency of these divorce proceedings. It appears to be undisputed that, from December 2005 to 2008, Olsun was solely responsible for repaying the loans described above and neither Cathy nor James, in their individual capacities, contributed toward those payments. In 2008, the debt to First DuPage Bank was discharged, and the personal guaranties and security agreements were cancelled, when Olsun, Olsun Wisconsin, and Cathy Asta Enterprises, LLC, refinanced with another lender and borrowed additional amounts via the issuance of industrial revenue bonds. One witness at trial described Cathy Asta Enterprises, LLC, as an affiliate of Olsun, and Cathy is the sole member of that company. There were apparently no personal guaranties or marital collateral involved in the 2008 refinancing. Olsun Wisconsin ceased operations in 2013.

¶ 12    The primary issue at the 2014 trial in these divorce proceedings was the characterization of the Olsun stock as either marital or nonmarital property. Cathy argued that she had inherited the stock in December 2005 and that it thus was her nonmarital property pursuant to section 503(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(a)(1) (West 2014)). James contended that the stock was marital property because Cathy had purchased it with the assistance of marital collateral and the parties' personal guaranties.

¶ 13    On January 30, 2015, the trial court entered a judgment for dissolution of marriage. The court determined that the 150 shares of Olsun stock were marital property. The court recognized that, because the stock was acquired during the marriage, it was presumed to be marital property and Cathy bore the burden of proving by clear and convincing evidence that she obtained it via inheritance. The court determined that Cathy had not met her burden, explaining as follows:

"Most importantly, Cathy cannot prove that she acquired the stock by way of a legacy, as her mother, Mary Jane Asta, was alive at the time of the acquisition of the stock by Cathy on December 13, 2005, and the mother's death was an express condition precedent under the will and trust to any future disposition of property to the children. Rather than the property being distributed according to the will, the children and their mother agreed to an alternative disposition in settlement of certain Probate litigation. Although similar to the will's provisions, in that Cathy Asta would have received a 1/3 interest in [Olsun] under the will, the settlement was not the actual disposition as contemplated in the will. Cathy's acquisition of the 1/3 interest, and more particularly the acquisition of the balance of the [Olsun] shares from her siblings, was by settlement and purchase, not inheritance. Under these facts and circumstances, Cathy cannot overcome the marital property presumption by clear and convincing evidence, and therefore the [Olsun] stock does not fall within the exception found in [section 503(a)(1) of the Act]."

The court then divided the marital property in accordance with its finding that the Olsun stock was marital. Instead of directly giving James an interest in the business, the court awarded him a $1.5 million judgment against Cathy. Cathy timely appealed, and James filed a timely cross-appeal.

¶ 14                                    II. ANALYSIS

¶ 15    The primary issue on appeal is whether the trial court correctly classified the 150 shares of Olsun stock as marital property. Additionally, Cathy contends, as does James in his cross-appeal, that the court erred in distributing the marital estate. For the reasons that follow, we hold that the Olsun stock is Cathy's nonmarital property.

¶ 16    Before distributing property as part of the dissolution of a marriage, the trial court must first determine whether that property is marital or nonmarital. *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 63.   There is a rebuttable presumption that property acquired during the marriage is marital property. *Dann*, 2012 IL App (2d) 100343, ¶ 63.  A party may overcome that presumption by producing clear and convincing evidence that one of the exceptions listed in section 503(a) of the Act applies. *Dann*, 2012 IL App (2d) 100343, ¶ 63.  Cathy and James agree that Cathy acquired the Olsun stock during their marriage and that she therefore bore the burden of rebutting the presumption that the stock is marital property.  In arguing that she inherited the stock, Cathy relies on section 503(a)(1) of the Act, which provides that nonmarital property includes "property acquired by gift, legacy or descent."   750 ILCS 5/503(a)(1) (West 2014).[1]

---

[1] During the pendency of this appeal, section 503 was amended by Public Act 99-90. Section 503(a)(1) now provides that nonmarital property includes "property acquired by gift, legacy or descent *or property acquired in exchange for such property*."  (Emphasis added.)  Pub. Act 99-90 (eff. Jan. 1, 2016) (amending 750 ILCS 5/503(a)(1) (West 2014)).   This is a nonsubstantive change, moving language that had previously been in section 503(a)(2) to section 503(a)(1).  We will cite the version of the statute that was in effect at the time of trial.  See 750 ILCS 5/801(d) (West 2014) ("In any action or proceeding in which an appeal was pending or a new trial was ordered prior to the effective date of this Act, the law in effect at the time of the order sustaining the appeal or the new trial governs the appeal, the new trial, and any subsequent trial or appeal."); *In re Marriage of Smith*, 162 Ill. App. 3d 792, 795 (1987) ("Section 801(d) refers to the [Act] itself, but it has been held that this section applies to amendments as well.").

Section 503(a)(1) may apply where a spouse receives property as his or her share of a trust. See *In re Marriage of Tatham*, 173 Ill. App. 3d 1072, 1080 (1988).

¶ 17 A trial court's classification of an asset as marital or nonmarital property will ordinarily be reversed only if it is against the manifest weight of the evidence. *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 9. The reason for this deferential standard of review is that the characterization of assets typically depends upon weighing witness credibility. *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 819 (2007). "However, where the determination is one of law and does not involve determinations of credibility, our review is *de novo*." *Faber*, 2016 IL App (2d) 131083, ¶ 9. In this case, the parties do not dispute the facts surrounding Cathy's acquisition of the stock, and all of the relevant evidence documenting the December 2005 transaction was admitted by stipulation. The trial court even commented at one point that this case involves "almost exclusively a question of law." For these reasons, *de novo* review is appropriate.

¶ 18 Addressing the parties' arguments regarding whether Cathy acquired the Olsun stock via "gift, legacy or descent" requires us to consider four related issues. One issue is whether Mary Jane's death was a condition precedent to any further disposition of property to the Asta children under August's will and the AFA Trust. Another issue is whether Cathy's acquisition of the stock pursuant to the settlement agreement was somehow different from what was contemplated in August's estate plan. Furthermore, we must consider whether Cathy purchased the stock such that it was not actually an inheritance. Finally, Cathy and James dispute the legal significance of both their personal guaranties and the fact that the loans involved in the December 2005 transaction were secured, in part, by marital collateral.

¶ 19 In concluding that Cathy failed to prove that she acquired the Olsun stock via "gift, legacy or descent," the trial court determined that Mary Jane's death "was an express condition

precedent under the will and trust to any future disposition of property to the children." James repeats this argument in his brief, but does not cite any case law in support of the trial court's finding on this particular point. We reject this argument. Under the plain language of the AFA Trust, surviving Mary Jane was not a condition precedent to the Asta children receiving property. During Mary Jane's lifetime, the trustee of the residuary trust was explicitly authorized to distribute to any one or more of August's descendants "all or as much of the principal" as might be in their best interests. Upon Mary Jane's death, "any unappointed portion of the then remaining trust estate" was to be distributed *per stirpes* in separate trusts to August's descendants who were alive as of such date. Accordingly, even before Mary Jane died, the trustee of the residuary trust would have been perfectly within his or her authority to distribute all or some of the trust principal to the Asta children, including Cathy.

¶ 20    Furthermore, nothing prevented Mary Jane from waiving her interest in the AFA Trust, as she agreed to do in the settlement agreement. When that occurred, her life estate terminated, and the Asta children's one-third remainder interests accelerated and became possessory. As explained in *Danz v. Danz*, 373 Ill. 482, 487-88 (1940):

> "Acceleration proceeds upon the basis that the time for distribution, to be determined solely from the intention of the testator as expressed or implied in the will, has arrived. [Citation.] The condition upon which the remainder is to take effect may be expressed as the decease or remarriage of the life tenant; but it will be construed to mean any event which removes the life estate, if such intention is expressed in or to be inferred from a reading of the entire will. [Citations.] This is not an arbitrary doctrine, but is founded on the presumed intention of the testator that the remainderman should take on the failure of the previous estate, notwithstanding the prior donee may still be alive. [Citations.] If, on

the other hand, the remainder is contingent upon the devisee surviving the life tenant, the devisee must literally survive the person named as life tenant, and not merely survive the life estate. [Citation.] Postponement of the remainder only in order to give the life tenant a life estate discloses an intention that it take effect upon removal of the life estate in any manner, and the remainder will be accelerated."

Nothing in August's estate plan suggests that he intended for his children to receive his property only if they "literally survived" their mother. Quite to the contrary, as explained above, the trustee could have distributed some or all of the trust principal to the children even while Mary Jane was alive. Accordingly, their one-third remainder interests became possessory once Mary Jane waived her interests in the AFA Trust.

¶ 21 Nor does the fact that the Asta family entered into a settlement agreement change our conclusion that Cathy acquired the Olsun stock by "gift, legacy or descent." In *Wolf v. Uhlemann*, 325 Ill. 165, 183 (1927), the supreme court stated:

"Undoubtedly, the members of a family are not privileged to alter the terms and provisions of a will merely for the convenience of the family or for the sole purpose of securing greater individual financial advantages than those specified in the will and intended by the testator. However, the rule is well established that courts of equity favor the settlement of disputes among members of a family by agreement rather than by resort to law. Where there is a reasonable or substantial basis for the belief or assurance that prolonged and expensive litigation will result over the proceeds or distribution of an estate, that the estate will be materially depleted, and that the family relationship will be torn asunder, the parties interested therein are warranted in preventing such *bona fide*

family controversy by a settlement agreement. Obviously, such an agreement must be impartial in every respect and must be obtained without fraud or deception." This is exactly what the Asta family did when it negotiated the settlement agreement that resulted in Cathy's acquisition of the Olsun stock in December 2005.[2] In the years following August's death, serious questions arose as to whether Mary Jane misappropriated funds and otherwise violated the terms of August's will and the AFA Trust. The record reflects that the ensuing litigation resulted in substantial attorney fees. Those fees certainly would have increased had the matter proceeded to trial, let alone an appeal.

¶ 22   The beneficiaries of the various trusts (Mary Jane, Cathy, Anthony, and John) collectively decided to settle their myriad disputes in a manner that was consistent with August's estate plan. Specifically, Mary Jane accepted a fixed salary from the businesses for life in exchange for waiving her interests in the AFA Trust, thus paving the way for the children to receive what were effectively equal portions of the residuary trust. Viewing the transaction in its proper context leads to the inescapable conclusion that Cathy simply received her share in the form of a 100% interest in the businesses rather than as a cash distribution. It bears emphasizing that the AFA Trust indicated that, upon Mary Jane's death (or upon the termination of the life estate by any other means), the residuary trust would be distributed in separate shares to August's descendants; the trust did not state that the children would each receive a one-third interest in Olsun specifically.

_____

[2] We reject James's contention that Cathy forfeited her argument based on *Wolf*, or any of her other arguments on appeal, by failing to raise them below. Cathy plainly argued in her written closing statement to the trial court that the settlement agreement did not change her inheritance, but merely determined which assets she would receive as her inheritance.

¶ 23    Although James does not make an issue of it, we note that Cathy, in her individual capacity—as opposed to her subtrust created under the AFA Trust—acquired the Olsun stock in December 2005.  As explained above, the AFA Trust provided that Cathy's share of the residuary trust would go to a subtrust established for her benefit.  However, the AFA Trust also allowed Cathy to withdraw the entirety of the principal from her subtrust at age 45.  The record indicates that Cathy was born in August 1959, so she would have been 46 years old in December 2005 when she acquired the stock.  Accordingly, the fact that Cathy acquired the stock in her individual capacity does not change our conclusion that she received it as her share of the residuary trust.

¶ 24    James nevertheless argues that Cathy did not inherit the stock, but rather purchased it for substantial economic consideration as part of an arm's length transaction.  The settlement agreement indeed indicated that Cathy would "purchase" the stock for $2 million.  Several documents filed in the probate litigation likewise speak of a purchase arrangement.  Citing cases involving the interpretation of contracts, James urges us to focus on the plain language of the settlement agreement to conclude that the December 2005 transaction was actually a sale.  See, *e.g.*, *Stichter v. Zuidema*, 269 Ill. App. 3d 455, 458 (1995) ("If a contract is not ambiguous, the express provisions govern and there is no need for further inquiry into the intention of the parties.").  To that end, James goes so far as to suggest that this court is "bound by the clear and unambiguous language" in the settlement agreement.

¶ 25    We disagree.  This case is not merely about interpreting the language of the settlement agreement, and we are not required to ignore the reality of the situation.  See *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 506 (1993) (the court determined that the husband received certain stock during the marriage only as a method of restoring his premarital equity in the company, not

as compensation for services, even though certain documents classified the transaction as "compensation"). Although the settlement agreement stated that Cathy would "purchase" the stock, that is not what actually happened. Cathy never spent a dime of her own money to acquire the stock, either in December 2005 or at any point thereafter. Instead, the transaction was funded by money in August's estate/trust, loans to Olsun, and a loan to the trustee of the land trust that owned the Commercial Street property. Moreover, testimony at trial established that Olsun made all of the payments toward those loans. Nor did the settlement agreement include a price per share or otherwise differentiate between the Olsun stock and the Olsun Wisconsin stock, which might be expected if Cathy were actually buying the businesses. Additionally, in light of the fact that Cathy had a possessory interest in one-third of the residuary trust created under the AFA Trust as soon as Mary Jane waived her interests, we have difficulty conceptualizing how Cathy could have purchased her own interest or why she would have had any incentive to do so.

¶ 26    This takes us to the final issue, one that the trial court did not address. Does the fact that the December 2005 transaction was funded, in part, by loans that were guaranteed by the parties and secured with some marital collateral mean that Cathy did not acquire the stock via "gift, legacy or descent"?[3]   The parties personally guaranteed the loans taken out by Olsun and the

---

[3] One of the changes made by Public Act 99-90, which went into effect during the pendency of this appeal, was the addition of section 503(a)(6.5), which lists a new category of nonmarital property: "all property acquired by a spouse by the sole use of non-marital property as collateral for a loan that then is used to acquire property during the marriage." Pub. Act 99-90 (eff. Jan. 1, 2016) (adding 750 ILCS 5/503(a)(6.5)). This new subsection also provides that "to the extent that the marital estate repays any portion of the loan, it shall be considered a contribution from the marital estate to the non-marital estate subject to reimbursement." Pub.

land trust, but they never contributed toward the repayment of those loans before the debt was refinanced with another lender. Additionally, as part of the collateral for the loans, Cathy and James signed mortgages with respect to three properties, all of which were titled to Cathy individually. One of those properties, a residence on North Bayview Lane in McHenry, Illinois ("the Bayview Lane property"), was ultimately determined in these divorce proceedings to be marital property; the other two are Cathy's nonmarital property.

¶ 27 James's arguments with respect to these mortgages and guaranties appear to be part and parcel of his broader contention that the December 2005 transaction was a sale rather than an inheritance. To that end, he relies most heavily on *In re Marriage of Hegge*, 285 Ill. App. 3d 138 (1996), and *In re Marriage of Kennedy*, 94 Ill. App. 3d 537 (1981). In *Hegge*, the court held that a wife did not meet her burden to prove that she acquired a residence known as the Petunia property in exchange for her nonmarital Merrill property, because her husband was named on the Petunia mortgage and marital funds were expended to pay down the mortgage. *Hegge*, 285 Ill. App. 3d at 143. In *Kennedy*, the court held that certain music stores that a husband opened during the parties' marriage were marital property, reasoning that (1) the stores were not "mere 'improvements' " to the stores that the husband had owned prior to the marriage, (2) the stores

Act 99-90 (eff. Jan. 1, 2016). During oral arguments in this matter, we gave the parties the opportunity to address whether the new section 503(a)(6.5) affects the issues in this appeal. Neither party contended that this provision impacts the arguments that they had made in their briefs based on case law decided prior to the amendments. Moreover, we reiterate that we must apply the law as it existed at the time of trial. 750 ILCS 5/801(d) (West 2014); *Smith*, 162 Ill. App. 3d at 795.

did not "come under any exception to the rule that property acquired during the marriage is marital," and (3) both spouses signed personal guaranties, and the money used to purchase the new stores was "raised substantially on marital credit." *Kennedy*, 94 Ill. App. 3d at 548.

¶ 28    The case at bar is distinguishable from *Hegge* and *Kennedy*. Unlike in *Hegge*, where the wife "failed to trace the entire purchase price of the [disputed property] to a nonmarital source," in the present case there is no similar evidence of commingling of marital and nonmarital funds. *Hegge*, 285 Ill. App. 3d at 143. Furthermore, *Kennedy* is distinguishable because there the critical question was whether certain stores that the husband opened during the marriage were "new and distinguishable" from the stores that he had owned before the marriage. *Kennedy*, 94 Ill. App. 3d at 548. It appears that the husband in *Kennedy* did not even argue that the new stores were his nonmarital property under any particular subsection of section 503(a) of the Act. Accordingly, that case is not instructive on the issue of whether Cathy acquired the Olsun stock via "gift, legacy or descent."

¶ 29    Cathy, for her part, relies on *In re Marriage of Blunda*, 299 Ill. App. 3d 855 (1998). In that case, the wife personally guaranteed a corporate loan *after* she had acquired the disputed stock by way of gift. *Blunda*, 299 Ill. App. 3d at 858-59. That distinguishes the matter from the present case, where the guaranties were part of the same transaction through which Cathy acquired the Olsun stock. Moreover, Cathy cites *In re Marriage of Drennan*, 93 Ill. App. 3d 903 (1981), and *In re Marriage of Guerra*, 153 Ill. App. 3d 550 (1987), to support her contention that "[i]t has been repeatedly rejected that the mere existence of marital collateral, where no actual transference of marital property occurs, results in the acquired property being characterized as marital." However, both of those cases are distinguishable. In *Drennan*, the husband acquired a certain residence *prior* to the marriage, and the question was whether that residence was

transmuted to marital property when the husband and wife took out a mortgage to pay off the husband's preexisting debt to his parents. *Drennan*, 93 Ill. App. 3d at 904. Unlike in *Drennan*, Cathy acquired the disputed stock during the marriage, not prior to it.

¶ 30    One of the issues in *Guerra* was the characterization of a residence that the husband purchased during the marriage with the proceeds from the sale of his nonmarital stock. *Guerra*, 153 Ill. App. 3d at 553-54. The husband had commingled those proceeds by temporarily depositing the funds in a joint bank account. *Guerra*, 153 Ill. App. 3d at 553-54. The question then became whether the husband overcame the presumption that he had intended to make a gift of the residence to the marital estate. *Guerra*, 153 Ill. App. 3d at 554. There is no similar issue of commingling in the present case. Moreover, unlike in the present case, in *Guerra* there was apparently no loan taken out in connection with the husband acquiring the disputed residence. Instead, the wife had merely signed a "note for the earnest money." *Guerra*, 153 Ill. App. 3d at 556.

¶ 31    The parties endeavor to extract from the cases they cite broad principles about the significance or insignificance of marital collateral and personal guaranties being used to acquire property during a marriage. However, unlike in the cases they discuss, here the marital collateral and personal guaranties were used only as a means of facilitating a distribution to Cathy from a trust that was established for her benefit. To the extent that the cases cited by the parties discuss the legal significance of marital collateral and personal guaranties in entirely different factual contexts, we find little guidance in those cases.

¶ 32    The only case that we have found where marital collateral was used to facilitate an inheritance is *In re Marriage of Wittenauer*, 103 Ill. App. 3d 53 (1981). In that case, in the husband's mother's will, she left a farm to the husband, on the condition that he pay her estate a

sum that was agreed to by the husband's six siblings. *Wittenauer*, 103 Ill. App. 3d at 54. When the husband's mother died, the siblings decided that $130,000 was a fair price for the farm, and the husband and his wife borrowed that amount to purchase the property. *Wittenauer*, 103 Ill. App. 3d at 54. The husband and wife took title to the property, and the $130,000 was distributed among the seven siblings. *Wittenauer*, 103 Ill. App. 3d at 54. When the husband and wife subsequently divorced, the trial court characterized one-seventh of the farm as the husband's nonmarital property. *Wittenauer*, 103 Ill. App. 3d at 54. The appellate court disagreed, reasoning that the husband "did not inherit one-seventh of the real estate from his mother; he inherited the option to purchase the entire parcel at a price agreed to by the other heirs." *Wittenauer*, 103 Ill. App. 3d at 54. According to the court, the husband and wife then exercised that option, borrowing funds to purchase the farm by posting certain of their jointly-owned property as collateral for the loan. *Wittenauer*, 103 Ill. App. 3d at 54. Acquired in such a manner, the farm was marital property. *Wittenauer*, 103 Ill. App. 3d at 54. The court noted that, although the husband did not inherit any portion of the farm itself, he did inherit one-seventh of the purchase price of the farm. *Wittenauer*, 103 Ill. App. 3d at 54. The court explained that the husband's share of the proceeds might have been regarded as his nonmarital property, had he kept it separate. *Wittenauer*, 103 Ill. App. 3d at 54. However, because he commingled his inheritance with marital funds, it became marital property. *Wittenauer*, 103 Ill. App. 3d at 54.

¶ 33    Unlike in *Wittenauer*, under the terms of the AFA Trust, when Mary Jane waived her interests, Cathy had a possessory interest in one-third of the corpus of the residuary trust; she did not inherit a mere right to purchase assets from the trust. Furthermore, unlike in *Wittenauer*, Cathy did not personally take out the loans at issue or use any of her own money—either marital or nonmarital—to acquire the stock. Accordingly, we likewise find little guidance in that case.

¶ 34    We refuse to lose sight of the forest for the trees. Nor should we reach an absurd result. Cathy acquired the Olsun stock under circumstances that were consistent with a distribution from a trust. More than $3.6 million in cash from August's estate and the AFA Trust was involved in the December 2005 transaction, along with $4,023,500 of borrowed funds. In this transaction, the Asta family paid off legal fees and estate taxes and effectively distributed the corpus of the residuary trust among August's three children. Neither Cathy nor James personally took out the loans at issue or otherwise expended any of their own money for Cathy to acquire the stock. Additionally, considering that two of the three mortgages that Cathy and James signed in December 2005 related to real estate that was ultimately determined to be Cathy's nonmarital property, the only marital collateral was the Bayview Lane property. According to the parties' stipulations, at the time of trial, they had only $57,500 worth of equity in that property (it was valued at $407,500, subject to a $350,000 mortgage with a lender other than First DuPage Bank). We are mindful that this case involves loans in excess of $4 million and marital collateral (which was never called upon) of substantially lesser value.

¶ 35    Moreover, the parties' guarantor support was seen as a tertiary form of repayment. As explained by Jennifer Barra, a former employee of First DuPage Bank who was involved in the December 2005 transaction:

> "For this transaction or [*sic*] to Olsun Electrics you have three sources of repayment generally speaking for every entity; primary would be the conversion of assets, cash flow of operations. Secondary, would be the liquidation of the business assets, and tertiary would be the guarantor support.
>
> ***

Primary, secondary and tertiary, that would be the order in which we would seek repayment. The loan gets repaid primarily through the cash flow of operations. Secondary, we would have the business assets, and we would liquefy [*sic*] those, and the third source would be your guarantor source."

Even were we to find *Kennedy* instructive, as James urges, we could not conclude under these circumstances that the loans in the present case were obtained "substantially on marital credit." *Kennedy*, 94 Ill. App. 3d at 548.

¶ 36 We therefore reject James's argument that the use of certain marital collateral and the parties' personal guaranties in facilitating the December 2005 transaction made Cathy's acquisition of the Olsun stock anything other than an inheritance. August founded Olsun more than 30 years before his daughter met James, and it is clear from August's estate plan that he intended to keep the company in his family. Unfortunately, after August died, disputes arose among his children and their mother with respect to the management of the probate estate and the AFA Trust. Those disputes were so significant as to threaten prolonged and expensive litigation that could materially deplete the estate and tear the family relationships apart. See *Wolf*, 325 Ill. at 183. The family settled the ensuing litigation in a manner that was both financially reasonable and consistent with August's estate plan. Despite what James argues, Cathy acquired the Olsun stock pursuant to her father's trust; she did not purchase the stock. Cathy met her burden to prove by clear and convincing evidence that she acquired the Olsun stock by "gift, legacy or descent" such that it is her nonmarital property pursuant to section 503(a)(1) of the Act.

¶ 37 Our conclusion on this point renders it unnecessary to reach the parties' remaining arguments. Indeed, the trial court might or might not deem it appropriate to redistribute the remaining marital property in light of our decision. See *Blunda*, 299 Ill. App. 3d at 869 (where

the appellate court's decision changed the total amount of marital property to be distributed, "reexamination of the division of the marital estate [was] required on remand"). We note that, as part of his cross-appeal, James raises an issue as to whether the trial court erred in denying his petition for interim attorney fees and costs. However, he does not develop a cogent argument in support of that contention. Nor does he present the factual background necessary to even understand what he is complaining about. Accordingly, the argument is forfeited. See *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 13 (argument that consisted of one conclusory paragraph without citation to authority was forfeited).

¶ 38                                      III. CONCLUSION

¶ 39      For the reasons stated, we reverse the judgment of the circuit court of Lake County and remand for further proceedings consistent with this opinion.

¶ 40      Reversed and remanded.